[Cite as *Ellis v. Fortner*, 2021-Ohio-1049.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

GAVIN ELLIS, etc., et al.

    Appellees

    v.

LAURA KENNY FORTNER, M.D., et al.

    Appellants

C.A. No.     28992

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.    CV 2016-07-2898

DECISION AND JOURNAL ENTRY

Dated: March 31, 2021

PER CURIAM.

{¶1} Laura Kenny Fortner, M.D. and Atrium OB/GYN, Inc. appeal the judgment of the Summit County Court of Common Pleas in favor of G.E., a minor, by and through his parents, Matthew and Lisa Ellis. We affirm.

I.

{¶2} The Ellises initiated a medical malpractice action in 2016 based upon events occurring during the labor and delivery of their son, G.E., in April 2001. Dr. Fortner, a physician employed by Atrium OB/GYN, Inc., provided medical care to Lisa Ellis at that time. Both Dr. Fortner and Atrium OB/GYN, Inc. ("collectively "the Atrium Group") were named as defendants.

{¶3} During labor and delivery, the descent of the fetus through the birth canal progressed slowly. After several hours, delivery was attempted using a vacuum extractor, which was unsuccessful. Dr. Fortner subsequently used a pair of Tucker-McLane forceps to extricate the baby from the birth canal. Upon delivery, the baby had an Apgar score of one, indicating severe

depression that required resuscitation. The baby's head exhibited a substantial caput, or swelling underneath the scalp, and bruising. G.E. was diagnosed with hypoxic ischemic encephalopathy ("HIE") and neonatal seizures.

{¶4} The Ellises alleged that Dr. Fortner was negligent and deviated from the accepted standards of care during labor and delivery, and that as result, G.E. sustained permanent structural brain damage resulting in developmental and cognitive impairments. The Ellises contended that Dr. Fortner failed to correctly evaluate the size and position of the fetus, failed to appreciate the need for a caesarian section, and failed to properly advise the Ellises as to the viability of a caesarian birth. At trial, a jury found in favor of the Ellises on their claim for medical negligence, with the trial court subsequently entering judgment. The Atrium Group now appeals raising nine assignments of error.

II.

ASSIGNMENT OF ERROR ONE

THE [TRIAL] COURT ABUSED ITS DISCRETION IN DENYING DEFENDANTS' *DAUBERT* MOTION TO EXCLUDE PLAINTIFFS' CCIE CAUSATION THEORY AND FURTHER, IN DOING SO WITHOUT CONDUCTING AN EVIDENTIARY HEARING[.]

{¶5} In their first assignment of error, the Atrium Group argues the trial court erred in denying its *Daubert* motion to exclude testimony of proximate cause premised upon cranial compression ischemic encephalopathy ("CCIE") because it failed to conduct an evidentiary hearing and because CCIE theory failed all four reliability factors set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993). We disagree.

{¶6} "In evaluating the reliability of scientific evidence, several factors are to be considered: (1) whether the theory or technique has been tested, (2) whether it has been subjected to peer review, (3) whether there is a known or potential rate of error, and (4) whether the

methodology has gained general acceptance." *Miller v. Bike Athletic Co.*, 80 Ohio St.3d 607, 611 (1998), citing *Daubert* at 593–594. "Nevertheless, the foregoing 'list of specific factors neither necessarily nor exclusively applies to all experts or in every case.'" *State v. Jackson*, 9th Dist. Summit Nos. 27132, 27200, 27133, and 27158, 2015-Ohio-5246, ¶ 53, quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999). The test of reliability is "flexible," and the trial court may, at its discretion, consider the factors to the extent relevant." *Id.*, citing *State v. Drummond*, 111 Ohio St.3d 14, 2006–Ohio–5084, ¶ 118. "The Ohio Supreme Court has cautioned that 'the reliability requirement * * * should not be used to exclude all evidence of questionable reliability * * *.'" *Id.*, quoting *Miller* at 614. "A trial court's role in determining whether an expert's testimony is admissible under Evid.R. 702(C) focuses on whether the opinion is based upon scientifically valid principles, not whether the expert's conclusions are correct or whether the testimony satisfies the proponent's burden of proof at trial." *Miller* at paragraph one of the syllabus.

{¶7}  "[A] trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho Tire Co., Ltd.* at 152. Consequently, "[t]he determination of the admissibility of expert testimony is within the discretion of the trial court." *Valentine v. Conrad*, 110 Ohio St.3d 42, 2006-Ohio-3561, ¶ 9. An abuse of discretion is more than an error of judgment; it means that the trial court was unreasonable, arbitrary, or unconscionable in its ruling. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). When applying the abuse of discretion standard, this Court may not substitute its judgment for that of the trial court. *Pons v. Ohio State Med. Bd.*, 66 Ohio St.3d 619, 621 (1993).

{¶8}  According to the Ellises' expert, Dr. Barry Schifrin, CCIE was coined by himself and colleagues to denote the mechanical contribution to hypoxic-ischemic injury that occurs with

the failure of fetal compensatory mechanisms to handle an interference with cerebral perfusion. The Atrium Group argues that CCIE has not been tested, has not been the subject of peer review, and has not gained general acceptance in the medical community, but rather, is consistently rejected by the medical community. The Atrium Group contends that not only did the trial court abuse its discretion in denying their *Daubert* motion, but that the trial court's failure to conduct a hearing constituted prejudicial error.

{¶9} To the extent that the Atrium Group argues that a trial court must hold a *Daubert* hearing prior to the testimony of an expert, the law does not support that argument. *See Sliwinski v. St. Edwards*, 9th Dist. Summit 27247, 2014-Ohio-4655, ¶ 15. "The trial court must have the same kind of latitude in deciding how to test an expert's reliability, and to decide whether or when special briefing or other proceedings are needed to investigate reliability, as it enjoys when it decides whether or not that expert's relevant testimony is reliable." (Emphasis omitted.) *Id.*, quoting *Kumho Tire Co.* at 152. Furthermore, in denying the Atrium Group's request for an oral hearing, the trial court noted that both the Ellises and the Atrium Group had submitted voluminous material on the subject and that the Atrium Group had failed to point to any specific or additional evidence it intended to offer.

{¶10} In its fourteen-page entry denying the Atrium Group's motion to exclude CCIE causation testimony, the trial court addressed each of the factors set forth in *Daubert*, examining the arguments set forth by both the Atrium Group and the Ellises in their briefs to the court. In this assignment of error, the Atrium Group raises those same arguments, but offers no explanation of why it believes the trial court's analysis was in error.

{¶11} The Atrium Group first argues that CCIE has not been tested. In addressing this argument, the trial court recognized the difficulty in testing human fetuses due to ethical

considerations and noted that similar testing had been done on animals. The trial court also noted that in his affidavit, Dr. Schifrin had cited "to extensive evidence and literature demonstrating 'that intracranial pressure is high enough to impair cerebral blood flow during contractions and that adequate rest between uterine contractions is essential to protect the fetal brain from hypoxic-ischemic insults during labor' and that 'excessive uterine activity is injurious to the fetal brain.'"

{¶12} The Atrium Group's second argument is that CCIE has never been the subject of peer review. Although there was evidence to support this argument, the trial court recognized that "the principles underlying the CCIE theory have been subject to peer review[,]" noting several areas of research identified by Dr. Schifrin in his affidavit. As to the third *Daubert* factor, the Atrium Group argues that there is no potential rate of error for studies on CCIE. In recognizing that it was not disputed that there was no known potential rate of error, the trial court correctly noted that this absence was not dispositive on the inquiry. *See Terry v. Caputo*, 115 Ohio St.3d 351, 2007-Ohio-5023, ¶ 25.

{¶13} The Atrium Group next argues that CCIE has not been generally accepted by the medical community. In addressing this argument, the trial court specifically acknowledged statements made by the American College of Obstetricians and Gynecologists ("ACOG") that CCIE had not gained general acceptance, but also acknowledged that its opinion was not completely unbiased because the ACOG had a concern with the effect that CCIE would have on the cost of medical services, and was not simply concerned with scientific principles. The trial court likewise acknowledged that the Ellises had pointed to a number of articles supporting the general theory that excessive intrauterine pressure and mechanical forces used during extraction can cause brain injury.

{¶14} Importantly, the trial court further pointed to the testimony of Dr. Schifrin that although the term "CCIE" was only coined in recent years, the principles associated with the process, namely the notion of mechanical trauma causing injury to the fetal brain, have been accepted for centuries, and that there is universal agreement that trauma to the fetal head and brain during labor and delivery can cause injury. The trial court also referenced the testimony of Dr. Stephen Glass, noting that although the phraseology for cranial compression may be new, the actual process has been described in medicine for the last fifty to one hundred years.

{¶15} We reiterate that under this assignment of error, the Atrium Group has raised no specific criticism of the trial court's analysis, which weighed the arguments and evidence as contained in the parties' briefs. The Atrium Group has failed to show that the trial court was unreasonable, arbitrary, or unconscionable in its ruling. As we have noted, the list of specific factors neither necessarily nor exclusively applies to all experts or in every case. *Jackson* at ¶ 53, citing *Kumho Tire Co.* at 141. Rather, the test of reliability is flexible, and the trial court may, at its discretion, consider the factors to the extent that they are relevant. *Id.*, citing *Drummond* at ¶ 118. The reliability requirement should not be used to exclude all evidence of questionable reliability. *Miller* at 614. Furthermore, the Atrium Group was given the opportunity to cross-examine the Ellises' experts and provide testimony to refute those experts' theory of the case, which it did through the testimony of its own experts who were critical of CCIE.

{¶16} Finally, we note that CCIE is not the sole theory of causation presented in this case. Dr. Glass, who gave a poster presentation on CCIE with Dr. Schifrin at a neurology conference in 2008, testified that G.E. would not have met the criteria for the poster because he experienced multifactorial trauma which would have provided an alternate explanation for injury. Dr. Derek Armstrong, a pediatric radiologist, testified that although he was not offering an opinion on

specific causation, there was an "event-causing injury" around the time of birth. Dr. Jeffrey Pomerance, a neonatologist, testified without reference to the CCIE nomenclature, that G.E. sustained an HIE injury during labor or delivery. Furthermore, Dr. Schifrin himself disputed the significance of focusing on the label of CCIE specifically, stating: "As I said, birth trauma, injury from the mechanical forces of labor * * * you cannot fail to know about these subjects. What you call it is something else. The fact is this is a significant cause of injury and has been known as a significant cause of injury for decades, if not centuries."

{¶17} The Atrium Group has failed to show that the trial court abused its discretion in denying its *Daubert* motion to exclude testimony of proximate cause theory premised upon CCIE. Therefore, the first assignment of error is overruled.

ASSIGNMENT OF ERROR TWO

THE [TRIAL] COURT ABUSED ITS DISCRETION IN DENYING DEFENDANTS' *DAUBERT* MOTION TO EXCLUDE PLAINTIFFS' CAUSATION THEORY REGARDING AUTISM SPECTRUM DISORDER AND IN DOING SO WITHOUT CONDUCTING AN EVIDENTIARY HEARING[.]

{¶18} In its second assignment of error, the Atrium Group argues that the trial court erred by denying their *Daubert* motion to exclude testimony of proximate cause premised upon the theory that autism spectrum disorder can be caused by HIE. We disagree.

{¶19} As we stated above, to the extent that the Atrium Group argues that a trial court must hold a *Daubert* hearing prior to the testimony of an expert, the law does not support that argument. *See Sliwinski v. St. Edwards*, 9th Dist. Summit 27247, 2014-Ohio-4655, ¶ 15. We also again observe that in denying the Atrium Group's request for an oral hearing, the trial court noted that both the Ellises and the Atrium Group had submitted voluminous material on the subject and that the Atrium Group had failed to point to any specific or additional evidence it intended to offer.

{¶20} With regard to the *Daubert* factors, the trial court concluded that although testing of the theory would be unethical and that no known rate of error was presented, multiple published peer review articles supported the theory. The trial court further concluded that based upon the articles provided by the Ellises and the opinions expressed by G.E.'s treating physicians, the theory had gained general acceptance. The trial court also noted that the Ellises' experts did not make a "blanket statement that birth trauma is the cause of ASD. Rather, they opine[d] that birth trauma [wa]s the cause of [G.E.'s] impairments, which Dr. [Jeanette] Wasserstein conclude[d] leads to a diagnosis of ASD."

{¶21} Although the Atrium Group provided testimony from experts expressing a view critical of the theory offered by the Ellises' experts, it has failed to set forth any argument in support of its assertion that there is no scientific basis to be extrapolated from the literature and studies that would support the theory. "In analyzing the admissibility of expert testimony, it is important for trial courts to keep in mind the separate functions of judge and jury, and the intent of *Daubert* to * * * make it easier to present legitimate conflicting views of experts for the jury's consideration." *Miller v. Bike Athletic Co.*, 80 Ohio St.3d 607, 613 (1998), quoting *Joiner v. Gen. Elec. Co.*, 78 F.3d 524, 530 (11th Cir.1996), *rev'd on other grounds*, 522 U.S. 136 (1997). "Thus, a trial court's role in determining whether an expert's testimony is admissible * * * focuses on whether the opinion is based upon scientifically valid principles, not whether the expert's conclusions are correct or whether the testimony satisfies the proponent's burden of proof at trial." *Id.* We again note that the reliability requirement of *Daubert* should not be used to exclude all evidence of questionable reliability. *Id.* at 614.

{¶22} The Atrium Group also points to the testimony of the Ellises' own expert, Dr. Stephen Glass, as rejecting the diagnosis of autism spectrum disorder. Dr. Glass, however, offered

a distinction that G.E. exhibited autistic-like symptoms a result of a brain injury, rather than having a primary autism spectrum disorder. The trial court's own comments as noted above indicated its awareness of these nuances. Furthermore, the Atrium Group was afforded the opportunity to explore this distinction in its cross-examination of Dr. Glass and in its presentation of its own expert witnesses.

{¶23} The Atrium Group has failed to show that the trial court abused its discretion in denying its *Daubert* motion to exclude testimony of proximate cause premised upon the theory that autism spectrum disorder can be caused by HIE. Therefore, the second assignment of error is overruled.

ASSIGNMENT OF ERROR THREE

THE [TRIAL] COURT ABUSED ITS DISCRETION WITH RESPECT TO THE DIRECT AND CROSS[-]EXAMINATIONS OF PLAINTIFFS' EXPERT, BARRY SCHIFRIN, M.D.

{¶24} In their third assignment of error, the Atrium Group argues that the trial court erred with regard to both the direct examination and the cross-examination of Dr. Barry Schifrin. We disagree.

{¶25} The trial court enjoys broad discretion regarding the admission or exclusion of evidence, and this Court will not overturn the trial court's ruling absent an abuse of discretion and a showing of material prejudice. *Drew v. Marino*, 9th Dist. Summit No. 21458, 2004–Ohio–1071, ¶ 8. The judgment of the trial court will be reversed only if the reviewing court finds that the trial court clearly abused its discretion by excluding the proffered evidence, and that the exclusion materially prejudiced the complaining party. *State v. Hymore*, 9 Ohio St.2d 122, 128 (1967). "Material prejudice occurs when, after weighing the prejudicial effect of the errors, we are unable to find that without the errors the fact finder would probably have reached the same decision."

*Zeber v. Herd*, 9th Dist. Summit No. 19602, 2000 WL 762843, *2 (June 14, 2000), citing *Hallworth v. Republic Steel Corp.*, 153 Ohio St. 349 (1950), paragraph three of the syllabus.

{¶26} Regarding the direct examination of Dr. Schifrin, the Atrium Group argues that although the trial court had limited Dr. Schifrin to expert testimony on the issue of causation, it erred by permitting him to offer opinions as to the standard of care. They contend that the Ellises were thus allowed to "backdoor" standard of care opinions through Dr. Schifrin's testimony on warning signs in fetal monitoring strips, risk factors for shoulder dystocia, feasibility of a sage vaginal delivery, assessment of fetal head station upon descent, prolonged labor, and the use of two instruments to complete delivery.

{¶27} The Atrium Group directs us to the testimony of Dr. Schifrin explaining the effects of head distortion and swelling on determining fetal station during descent. The Atrium Group objected to the testimony at trial, arguing that it constituted a standard of care opinion, while the Ellises argued that such testimony was merely setting groundwork for evidence that would show that a mid-pelvic injury was sustained in part due to the location of the fetus. The trial court warned plaintiff's counsel that the testimony he was eliciting was standard of care and that he was "treading into that area." The trial court noted that although the testimony was not cumulative at that point, it could preclude the Ellises from offering testimony from another expert that would be cumulative later. The trial court explained: "I think it is important to note for the record that [Dr. Schifrin] did not directly say that Dr. Fortner did anything wrong, did not directly state that he was critical of anything that she did, did not directly opine on the standard of care, nor was he asked." Regarding the concern about Dr. Schifrin's testimony, the court further expounded: "He did make reference to issues that I think overlap with standard of care, that I think can be cured on cross without highlighting his opinions in that regard." Likewise, during Dr. Schifrin's cross-

examination, the trial court cautioned the Atrium Group's counsel: "Yesterday you took a significant amount of time making objections that you thought Dr. Schifrin was treading into the standard of care. I did not agree that he did that to the extent that required any action by the [c]ourt. Now you are asking him questions, inviting him to assess whether Dr. Fortner met the standard of care, and I'm pointing that out to you so you can rephrase if you want to * * *."

{¶28} We cannot conclude that the trial court was unreasonable, arbitrary, or unconscionable in its rulings on Dr. Schifrin's direct examination. The trial court was cognizant of potential cumulative testimony and took reasonable steps to limit its effect. To the extent that the Atrium Group argues that Dr. Schifrin failed to meet the qualifications of an expert testifying on the issue of standard of care, we conclude that the argument has been forfeited because they failed to object on those grounds at trial. *See State v. Ritchie*, 9th Dist. Lorain No. 95CA006211, 1997 WL 164323, *3 (Apr. 2, 1997).

{¶29} The Atrium Group further argues the trial court abused its discretion in its rulings during the cross-examination of Dr. Schifrin. A trial court possesses broad discretion in controlling the scope of cross-examination, and the court's ruling will not be reversed unless there is an abuse of discretion. *In re Verba,* 9th Dist. Summit No. 14529, 1990 WL 139872, *3 (Sept. 26, 1990), citing *O'Brien v. Angley*, 63 Ohio St.2d 159, 163 (1980). Pursuant to Evid.R. 611(B), cross-examination is permitted on all relevant matters and those affecting credibility of witnesses. The character and extent of cross-examination regarding an appropriate subject matter is within the sound discretion of the trial court. *State v. Kish*, 9th Dist. Lorain No. 02CA008146, 2003-Ohio-2426, ¶ 12, citing *State v. Green*, 66 Ohio St.3d 141, 147 (1993). "As such, an appellate court should be slow to disturb a trial court's determination on the scope of cross-examination

unless the trial court has abused its discretion and the party illustrates a material prejudice." *Bender v. Bender*, 9th Dist. Summit No. 20157, 2001 WL 808975, *7 (July 18, 2001).

{¶30} We further note that an appellant bears the burden of affirmatively demonstrating the error on appeal and substantiating his or her arguments in support. *Angle v. W. Res. Mut. Ins. Co.*, 9th Dist. Medina No. 2729-M, 1998 WL 646548, *1 (Sept. 16, 1998); *Frecska v. Frecska*, 9th Dist. Wayne No. 96CA0086, 1997 WL 625488, *2 (Oct. 1, 1997). *See also* App.R. 16(A)(7) and Loc.R. 7(B)(7). Furthermore, Loc.R. 7(F) specifically provides that "[r]eferences to the pertinent parts of the record shall be included in the * * * argument section of the brief. If a party fails to include a reference to a part of the record that is necessary to the court's review, the court may disregard the assignment of error or argument." Moreover, "[i]f an argument exists that can support this assignment of error, it is not this [C]ourt's duty to root it out." *Cardone v. Cardone,* 9th Dist. Summit No. 18349, 1998 WL 224934, *8 (May 6, 1998).

{¶31} As to the cross-examination of Dr. Schifrin, the Atrium Group first argues that the trial court erred by prohibiting questions regarding the ACOG's rejection of a request to include CCIE within publications as an accepted theory. They contend that Dr. Schifrin had knowledge of such a request made by one of his associates, Dr. Stuart Ater, in a letter to the ACOG. The Atrium Group has failed to reference any section of the record establishing the alleged error by the trial court and has failed to indicate any objection in the record to such a ruling. As such, they have failed to meet their burden of demonstrating the error on appeal. *See* App.R. 16(A)(7); Loc.R. 7(B)(7); Loc.R. 7(F).

{¶32} The Atrium Group next argues the trial court erred by precluding them from cross-examining Dr. Schifrin regarding his censure by the ACOG and that the trial court erred in precluding them from questioning Dr. Schifrin about other courts disallowing his testimony on the

issue of CCIE in other cases. Prior to the commencement of the trial, the trial court made tentative, preliminary rulings on the Ellises' motions in limine concerning these issues, stating that "as we sit here today" they were granted. The Atrium Group fails to identify any renewed objection and subsequent ruling by the trial court. Consequently, they failed to preserve these issues for appeal. *See PNH, Inc. v. Barnitt*, 9th Dist. Summit No. 24089, 2008-Ohio-5440, ¶ 19.

{¶33} The Atrium Group further argues that the trial court erred by precluding them from questioning Dr. Schifrin regarding the affidavit of Dr. Volpe wherein he clarifies what he believes was the misuse of a quote from his textbook. Counsel stated that the affidavit was proffered into evidence as a "precautionary" measure, dependent upon the Ellises' use of the textbook. In addition to the issue of the authentication of the affidavit, the trial court expressed concern that it was "specifically applicable to facts in a case for which it was proffered, and this is a different case with different facts, so I don't think that it's relevant, and I think the use of it would be more prejudicial than probative * * *."

{¶34} Although the affidavit was proffered into evidence, the Atrium Group has failed to direct us to any testimony regarding Dr. Volpe's textbook, any attempt to introduce the affidavit to counter such testimony, any ruling by the trial court precluding on such an attempt, or any subsequent objection. The Atrium Group has thus failed to establish any abuse of discretion on the part of the trial court.

{¶35} The Atrium Group's third assignment of error is overruled.

ASSIGNMENT OF ERROR FOUR

THE [TRIAL] COURT ABUSED ITS DISCRETION IN EXCLUDING THE TRIAL TESTIMONY OF DEFENDANTS' EXPERTS, FRED VOLKMAR, M.D. AND MICHAEL BELFORT, M.D.

**{¶36}** In their fourth assignment of error, the Atrium Group argues the trial court erred by excluding the trial testimony of Dr. Fred Volkmar and Dr. Michael Belfort. We disagree.

**{¶37}** "A decision to admit or exclude evidence will be upheld absent an abuse of discretion." *Beard v. Meridia Huron Hosp.*, 106 Ohio St.3d 237, 2005-Ohio-4787, ¶ 20. "Even in the event of an abuse of discretion, a judgment will not be disturbed unless the abuse affected the substantial rights of the adverse party or is inconsistent with substantial justice." *Id.* "Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected * * *." Evid.R. 103(A).

**{¶38}** The Atrium Group informed the trial court that they intended to call Dr. Volkmar, a psychiatrist, to speak on the science of autism spectrum disorder and the absence of a link with traumatic brain injury. The trial court was concerned that the intended testimony had already been given by Dr. Hudson Gerry Taylor, a neuropsychologist, and that Dr. Volkmar's testimony would therefore be cumulative. In subsequently deciding to exclude Dr. Volkmar as a witness, the trial court stated that although the two experts' qualifications were different, Dr. Taylor specifically addressed the issues of connections between perinatal insult and autism disorder, neonatal encephalopathy and autism spectrum disorder. The trial further found that Dr. Taylor was asked both on direct and cross-examination about his conclusions regarding a connection between any brain insult suffered by G.E. and his subsequent development, and was asked if there was literature addressing the connection a traumatic brain injury and autism spectrum disorder. The trial court found that those conclusions and theories had been thoroughly addressed with Dr. Taylor, and that it was not inclined to allow Dr. Volkmar's testimony because it would be cumulative.

**{¶39}** On direct examination, Dr. Taylor was asked about his understanding of the literature regarding neonatal events and autism spectrum disorder and offered testimony that "in

general" there was not evidence from the literature to support a causal connection between perinatal brain insult and autism spectrum disorder. Likewise, on cross-examination, Dr. Taylor was asked about studies linking autism to encephalopathy, and on redirect examination, he was further asked if there was any literature indicating a causal link between perinatal events and autism.

{¶40} The Atrium Group has failed to establish any abuse of discretion in the trial court's decision to exclude the testimony of Dr. Volkmar. They have also failed to establish that, even if the trial court had erred in excluding the testimony, a substantial right was affected.

{¶41} With regard to Dr. Belfort, in an order issued prior to trial, the trial court excluded him from the discovery process, limiting the Atrium Group to two experts on "physician standard of care." In doing so, the trial court noted that the Atrium Group had identified three standard of care experts: Dr. Patrick Naples, an OB/GYN, and Drs. Leo Brancazio and Michael Belfort, experts in maternal fetal medicine. Although the Ellises argued that all three doctors reported the same opinion, the trial court found that Dr. Naples' report differed from Dr. Brancazio's and Dr. Belfort's reports. The trial court further noted, however, that the Atrium Group had not identified any distinctions as to the credentials or opinions of Dr. Brancazio and Dr. Belfort, and that although Dr. Brancazio and Dr. Naples had been deposed by the parties, Dr. Belfort had not yet been deposed. Based upon these circumstances, the trial court excluded Dr. Belfort for the purposes of discovery.

{¶42} The Atrium Group has failed to establish that Dr. Belfort would have provided any expert testimony on the issue of CCIE that was not already supplied by other expert witnesses. Likewise, the Atrium Group has failed to show any error by the trial court in excluding Dr. Belfort from discovery.

{¶43} The Atrium Group's fourth assignment of error is overruled.

ASSIGNMENT OF ERROR FIVE

THE [TRIAL] COURT ABUSED ITS DISCRETION IN LIMITING THE SCOPE OF THE TRIAL TESTIMONY OF DEFENDANTS' EXPERT JAY GOLDSMITH, M.D.

{¶44} In their fifth assignment of error, the Atrium Group argues that the trial court erred by limiting the scope of their expert witness Dr. Jay Goldsmith. We disagree.

{¶45} The decision to admit or exclude evidence lies in the sound discretion of the trial court. *State v. Sage*, 31 Ohio St.3d 173, 180 (1987). "Absent an issue of law, this Court, therefore, reviews the trial court's decision regarding evidentiary matters under an abuse of discretion standard of review." *State v. Aguirre*, 9th Dist. Lorain No. 13CA010418, 2015-Ohio-922, ¶ 6.

{¶46} The Atrium Group first argues that the trial court erred in prohibiting Dr. Goldsmith's testimony regarding his alleged experience on the ACOG task force that rejected CCIE theory for publication as a recognized mechanism of fetal brain injury. In rejecting the Atrium Group's request to raise these questions with Dr. Goldsmith, the trial court stated:

> I don't think it's unfair to ask him about his knowledge regarding the science and why he doesn't believe that it's a viable theory. * * * What we're not going to do is bring in evidence that some third-party organization's standards didn't allow it to be published for this, that, or any other reason. I think that is not relevant, and think even if it was somewhat probative, it's more prejudicial than probative, and I'm not going to allow that.
>
> * * *
> So just as long as we're on the same page, and I think we are, the science itself, the [c]ourt has never prevented either party from identifying and exploring with their experts and talking to the jury about the reasons why they think it is or isn't valid and why it does or doesn't apply in this case.

{¶47} The Atrium Group further argues the trial court erred in precluding Dr. Goldsmith from testifying about the United States Preventative Services Task Force ("USPSTF") system for evaluating the value of scientific evidence, which grades the value of the evidence and the degree

to which it can be relied upon. In rejecting the Atrium Group's request to pursue this testimony, the trial court stated:

> Well, again, he can talk about the science itself. To the extent he wants to bring in some outside parameters or values with respect to that, the [c]ourt is not going to allow. And frankly, I think it's confusing to the jury for a number of reasons. The jury has heard from multiple experts now about whether the label is used, whether it's the science underlying the label, whether it's the principles of what someone calls CCIE and someone else just calls birth trauma. That's going to be for the jury to sort out.

> * * * [H]e's not going to be allowed to get into these outside guidelines or parameters. The jury is going to be instructed as to what the law requires.

{¶48} Accordingly, although Dr. Goldsmith was prohibited from testifying as to his involvement in reviewing CCIE for the ACOG or the USPSTF system, he testified that the theory of CCIE was not generally accepted and that the theory did not make sense to him based upon its failure to satisfy "a four-tier chain of events which have to be met in order for this science to be valid."

{¶49} The Atrium Group has failed to show that either of these decisions to limit testimony were an abuse of discretion by the trial court. The Atrium Group's fifth assignment of error is overruled.

## ASSIGNMENT OF ERROR SIX

THE [TRIAL] COURT ABUSED ITS DISCRETION WITH RESPECT TO THE TRIAL TESTIMONY OF PLAINTIFFS' EXPERT, JEANETTE WASSERSTEIN, PH.D.

{¶50} In their sixth assignment of error, the Atrium Group argues the trial court erred in allowing Dr. Jeanette Wasserstein to offer medical opinions. We disagree.

{¶51} Dr. Wasserstein testified that she is a licensed neuropsychologist who is a specialist in adult variations of neurodevelopmental disorders. She teaches neuropsychology, engages in clinical practice, and performs forensic neuropsychology evaluations. Her testimony included

various statements that G.E.'s cognitive and intellectual impairments were caused by brain damage.

{¶52} The Atrium Group contend that because Dr. Wasserstein is not a licensed physician, she may not make a medical diagnosis or express causation opinions based upon those diagnoses. In support of this contention, the Atrium Group relies on two cases from outside of the Ninth District: *Robertson v. Mt. Carmel East Hosp.*, 10th Dist. Franklin No. 09AP-931, 2011-Ohio-2043, and *Hager v. Fairview Gen. Hosp.*, 8th Dist. Cuyahoga No. 83266, 2004-Ohio-3959. The holdings of these cases, however, are not as broad as the Atrium Group suggests.

{¶53} In *Robertson*, the Tenth District Court of Appeals concluded that the trial court had properly excluded the testimony of an ostomy nurse on the issue of proximate cause. *Robertson* at ¶ 30. In reaching its conclusion, the court relied upon R.C. 4723.151, which prohibits nurses from making medical diagnoses. The court also pointed to *Hager v. Fairview Gen. Hosp.*, which is likewise cited by the Atrium Group. *Id.* In *Hager*, the Eighth District Court of Appeals concluded that the trial court did not err in precluding a registered nurse from offering an expert opinion on the proximate cause of a dental condition. *Hager* at ¶ 48. In reaching its conclusion, the court determined there was no evidence that the nurse had any knowledge, skill, or experience in the field of dentistry, and it was therefore not established that the nurse had the necessary qualifications to testify as to proximate cause. *Id.* at ¶ 46.

{¶54} Both of these cases are distinguishable from the matter now before us for review. Dr. Wasserstein is not a nurse, but rather, a licensed neuropsychologist with a clinical practice. The Atrium Group have not argued that Dr. Wasserstein lacks the qualifications of an expert in her field and have failed to establish that she was not qualified to offer the testimony at issue. Furthermore, the Supreme Court of Ohio has held "A witness who is not a physician, but who

qualifies as an expert under Evid.R. 702, may give evidence that would be relevant to diagnosis of a medical condition it the testimony is within the expertise of the witness. *Shilling v. Mobile Analytical Serv., Inc.*, 65 Ohio St.3d 252 (1992), syllabus. *See also Ward v. Anheuser-Busch, Inc.*, 9th Dist. Lorain No. 3640, 1984 WL 4022, *1 * (Nov. 7, 1984)(holding that the opinion of a microbiologist on the medical issue of causation of an illness linked to the ingestion of bacteria was within her range of expertise and thus admissible).

{¶55} The Atrium Group's sixth assignment of error is overruled.

ASSIGNMENT OF ERROR SEVEN

THE [TRIAL] COURT ABUSED ITS DISCRETION IN ALLOWING IMPERMISSIBLE CROSS[-]EXAMINATION OF DEFENDANT, LAURA FORTNER, M.D., REGARDING MATTERS OF HER PERSONAL BUSINESS THAT OCCURRED SUBSEQUENT TO THE EVENTS OF THIS CASE[.]

{¶56} In their seventh assignment of error, the Atrium Group argues the trial court erred by allowing the Ellises to question Dr. Fortner regarding a business venture she started several years after G.E.'s birth. We disagree.

{¶57} The testimony in question was as follows:

Q. Doctor, you have an interest in a skin care company called Arbonne, today?

A. I have my own business, yes, also.

Q. Is it like a franchise? Or what do you mean your "own business"?

A. I'm an independent consultant.

Q. For Arbonne?

A. For Arbonne.

Q. Any other company that you consult with?

A. No. No. I also do medical missions and have an OBGyn clinic that I have set up in Guatemala, so I do that as well.

Q. For Arbonne, aren't you regional vice[-]president?

A. No, that is not correct.

Q. The reason you went into the skin care business is because you didn't – you weren't happy with the lifestyle that is required of an obstetrician?

A. The reason why I started that business – and I started that business back in 2007, so not when this delivery occurred, but I did that because I'm a mom of four, and I wanted to be home more with my babies.

Q. I understand that. Were you unhappy with – strike that, Your Honor.

{¶58} The Atrium Group argues that the only purpose of the testimony was to suggest to the jury that Dr. Fortner was uncaring and didn't enjoy the practice of medicine. After the Atrium Group's objection at trial, at a sidebar, counsel for the Ellises stated that "people can conclude that folks who are unhappy with their work aren't as careful, and I think it is relevant." The trial court subsequently overruled the Atrium Group's objection.

{¶59} The Atrium Group have failed to show any prejudice as a result of this testimony at issue, and the record before us does not reveal that the Atrium Group were prejudiced by the testimony. The Atrium Group have also failed to provide any authority in support of their contention that the cross-examination was impermissible and have failed to establish that the trial court abused its discretion in allowing the cross-examination.

{¶60} The Atrium Group's seventh assignment of error is overruled.

ASSIGNMENT OF ERROR EIGHT

THE [TRIAL] COURT ABUSED ITS DISCRETION IN ALLOWING PLAINTIFFS' STANDARD OF CARE EXPERT, BENJAMIN HAMAR, M.D., TO OFFER PROXIMATE CAUSE OPINIONS[.]

{¶61} In their eighth assignment of error, the Atrium Group argues the trial court erred by allowing Dr. Benjamin Hamar to testify as to the issue of proximate cause. We disagree.

{¶62} At issue is testimony from Dr. Hamar that failure to perform a caesarean delivery resulted in harm to G.E. Dr. Hamar did not testify, however, as to the exact mechanism of that injury. In allowing the testimony, the trial court concluded that the testimony was not cumulative and did not constitute specific causation testimony.

{¶63} In this assignment of error, the Atrium Group contend that the trial court initially limited Dr. Hamar's testimony to the standard of care, and that he was therefore prohibited from offering an opinion as to proximate cause. The Atrium Group provide no authority in support of this argument, provide no indication that they suffered any prejudice as a consequence, provide no evidence that Dr. Hamar was not qualified to offer such testimony, and fail to establish that the trial court's decision to allow such testimony amounted to an abuse of discretion.

{¶64} The Atrium Group's eighth assignment of error is overruled.

ASSIGNMENT OF ERROR NINE

THE CUMULATIVE EFFECT OF THE [TRIAL] COURT'S ERRORS DENIED DEFENDANTS A FAIR TRIAL[.]

{¶65} In their ninth assignment of error, the Atrium Group argues that even if any individual error by the trial court did not constitute cause for reversal, the cumulative effect of the errors deprived them of a fair trial. We disagree.

{¶66} Initially we note that this Court has previously recognized that "the cumulative error doctrine is not typically employed in civil cases." *McMichael v. Akron Gen. Med. Ctr.*, 9th Dist. Summit No. 28333, 2017-Ohio-7594, ¶ 90, quoting *J.P. v. T.H.*, 9th Dist. Lorain No. 14CA010715, 2016-Ohio-243, ¶ 35, quoting *Stanley v. Ohio State Univ. Med. Ctr.*, 10th Dist. Franklin No. 12AP-999, 2013-Ohio-5140, ¶ 124. However, even if we were to apply it to the present case, having determined thus far that the Atrium Group have failed to show error by the trial court, we conclude there is no cumulative effect.

{¶67} The Atrium Group's ninth assignment of error is overruled.

III.

{¶68} The Atrium Group's nine assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

THOMAS A. TEODOSIO
FOR THE COURT

TEODOSIO, P. J.
CONCURS.

CARR, J.
CONCURRING IN JUDGMENT ONLY.

{¶69} I concur in the lead opinion's judgment to affirm. However, as I do not agree with all of the reasoning of the lead opinion, I concur in judgment only and write separately.

{¶70} With respect to the first assignment of error, I agree with the analysis of the dissenting opinion which concludes that the trial court abused its discretion in admitting expert testimony pertaining to CCIE. I disagree though that the admission of the CCIE testimony was so prejudicial as to warrant a new trial because I cannot say that the "refusal to take such action appears * * * inconsistent with substantial justice." *See* Civ. R. 61. I therefore concur that the assignment of error is properly overruled.

{¶71} As to the second assignment of error, though I agree with my colleagues that ASD testimony was properly admitted, I would adopt the rationale of the dissenting opinion in doing so.

{¶72} In addition, while I agree with the lead opinion that the remaining assignments of error should be overruled, I, nonetheless, would conclude that Dr. Wasserstein, as a neuropsychologist, could not opine as to causation, i.e. that the autistic-like symptoms were caused by brain damage at birth. I cannot say that the admission of that testimony was prejudicial though, given its limited nature and other testimony properly admitted on causation. I would not find reversible error in any of the remaining assignments of error and therefore, concur with the lead opinion to affirm but concur in judgment only.

CALLAHAN, J.
CONCURRING IN PART, AND DISSENTING IN PART.

{¶73} I concur in the lead opinion to the extent that it overrules the second assignment of error, but I write separately to explain my reasoning in that regard. I disagree with the lead

opinion's resolution of the first assignment of error and, because the error in admitting evidence related to "cerebral compression ischemic encephalopathy" ("CCIE") was inconsistent with substantial justice and affected the substantial rights of the defendants, I would reverse the trial court's judgment and remand this matter for a new trial. Accordingly, I believe it is unnecessary to address the remaining assignments of error.

I.

{¶74} In their first assignment of error, Dr. Laura Fortner, M.D. and Atrium OB/GYN, Inc. ("Atrium") argue that the trial court abused its discretion by denying their motion to exclude evidence related to one of the Ellises' theories of causation underlying their claims for medical malpractice. Specifically, Dr. Fortner and Atrium have argued that this evidence was inadmissible under Evid.R. 702(C) because it lacked the indicia of reliability articulated by the United States Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

{¶75} In *Daubert*, the United States Supreme Court considered whether Fed.R.Evid. 702 required general acceptance of principles underlying a scientific theory in order for expert testimony to be admissible, as set forth in *Frye v. United States*, 293 F. 1013 (D.C. Cir.1923). Although the general acceptance test was widely recognized at the time, the Court rejected that position, concluding that it was superseded by the adoption of the Federal Rules of Evidence. *Daubert* at 587-589. Nonetheless, the Court recognized that Fed.R.Evid 702 "clearly contemplates some degree of regulation of the subjects and theories about which an expert may testify." *Id*. at 589. The Court concluded that by its reference to the phrase "scientific knowledge," the Rule itself placed limitations on the admissibility of evidence:

> The subject of an expert's testimony must be "scientific ... knowledge." The adjective "scientific" implies a grounding in the methods and procedures of science. Similarly, the word "knowledge" connotes more than subjective belief or unsupported speculation. The term "applies to any body of known facts or to any

body of ideas inferred from such facts or accepted as truths on good grounds." Webster's Third New International Dictionary 1252 (1986). Of course, it would be unreasonable to conclude that the subject of scientific testimony must be "known" to a certainty; arguably, there are no certainties in science. * * * *But, in order to qualify as "scientific knowledge," an inference or assertion must be derived by the scientific method. Proposed testimony must be supported by appropriate validation—i.e., "good grounds," based on what is known.* In short, the requirement that an expert's testimony pertain to "scientific knowledge" establishes a standard of evidentiary reliability.

(Emphasis added.) *Daubert* at 590. Consequently, the Court determined that Fed.R.Evid. 702 imposes an obligation upon trial courts to make a threshold determination regarding the characterization of proposed evidence as "scientific knowledge." *Daubert* at 592. The Court explained that "[t]his entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id*. at 592-593.

{¶76} Although the United States Supreme Court did not "presume to set out a definitive checklist or test" that controls this assessment, noting that "[m]any factors will bear on the inquiry," *Daubert* articulated certain "general observations" that frame the inquiry. *Id*. at 593. A "key question," the Court noted, is whether it is capable of being tested and, if so, whether it has undergone such testing. *Id.* "'Scientific methodology today is based on generating hypotheses and testing them to see if they can be falsified; indeed, this methodology is what distinguishes science from other fields of human inquiry.'" *Id.*, quoting E. Green & C. Nesson, *Problems, Cases, and Materials on Evidence* 645 (1983). The Court also observed that although publication and peer review "does not necessarily correlate with reliability," whether a theory has been subject to peer review and publication is "a relevant, though not dispositive, consideration." *Daubert* at 594. ("Some propositions * * * are too particular, too new, or of too limited interest to be published. But submission to the scrutiny of the scientific community is a component of 'good science,' in

part because it increases the likelihood that substantive flaws in methodology will be detected."). With respect to scientific techniques, courts should consider the "known or potential rate of error." *Id*. at 595. Finally, although acknowledging that the general acceptance test is no longer determinative, *Daubert* recognized that "[w]idespread acceptance can be an important factor in ruling particular evidence admissible, and 'a known technique which has been able to attract only minimal support within the community,' [*United States v. Downing*, 753 F.2d 1224, 1238 (3rd Cir.1985)], may properly be viewed with skepticism." (Emphasis omitted.) *Daubert* at 594. Because the determination of reliability is flexible, "a trial court may consider one or more of the more specific factors that *Daubert* mentioned when doing so will help determine that testimony's reliability[,]" but those factors "neither necessarily nor exclusively appl[y] to all experts or in every case." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999).

{¶77} Under Evid.R. 702(C), testimony of a qualified expert is admissible as long as it "is based on *reliable scientific*, technical, or other specialized *information*." (Emphasis added.) In *Miller v. Bike Athletic Co.*, 80 Ohio St.3d 607 (1998), the Ohio Supreme Court determined that, like its federal counterpart, Evid.R. 702(C) requires a threshold determination of the reliability of scientific evidence. *See Miller* at 611. The Court adopted the reasoning of *Daubert* with respect to this determination and concluded that the four factors identified by the United States Supreme Court in *Daubert* were instructive under Evid.R. 702(C). *See id.* at 611-12. *See also Brook Park v. Rodojev*, 161 Ohio St.3d 58, 2020-Ohio-3253, ¶ 33 ("In *Miller* * * * this court adopted from *Daubert* four factors to be considered by a court in evaluating the reliability of scientific evidence[.]"). This determination focuses on the particular *type* of scientific evidence that is at issue rather than whether an alleged scientific fact is true in the context of the case at hand. *State v. Nemeth*, 82 Ohio St.3d 202, 211 (1998). In other words, the "inquiry focuses on whether the

principles and methods * * * employed to reach [an] opinion are reliable, not whether [the expert's] conclusions are correct." *Miller* at 611. The scientific reliability of the basis for the proposed expert testimony is at issue, not whether that testimony satisfies the proponent's burden of proof. *Id.* at paragraph one of the syllabus.

{¶78} This Court must review a trial court's exercise of its gatekeeping function under *Daubert* for an abuse of discretion. *See Kumho Tire Co., Ltd.* at 138-139, citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 138-139 (1997). An abuse of discretion is present when a trial court's decision "'is contrary to law, unreasonable, not supported by evidence, or grossly unsound.'" *Menke v. Menke*, 9th Dist. Summit No. 27330, 2015-Ohio-2507, ¶ 8, quoting *Tretola v. Tretola*, 3d Dist. Logan No. 8-14-24, 2015-Ohio-1999, ¶ 25.

{¶79} We must consider whether the trial court abused its discretion in conjunction with the record which, in this case, consists solely of documentary evidence, deposition testimony, and affidavits. With respect to the record, Dr. Fortner and Atrium's assignment of error asserts that the trial court erred by denying their *Daubert* motion without conducting a hearing. The body of their assignment of error does not develop this argument, and I cannot conclude that the trial court erred by denying the defendants' respective motions for a hearing on their *Daubert* motions. *See Kumho Tire Co., Ltd.* at 152 ("The trial court must have the same kind of latitude in deciding *how* to test an expert's reliability, and to decide whether or when special briefing or other proceedings are needed to investigate reliability, as it enjoys when it decides *whether or not* that expert's relevant testimony is reliable."). (Emphasis in original.) *See also Sliwinski v. The Village at St. Edwards*, 9th Dist. Summit No. 27247, 2014-Ohio-4655, ¶ 15, quoting *Kumho Tire Co., Ltd.* at 152. Nonetheless, I observe at the outset that *all* parties in this case may have benefitted from the opportunity to offer testimony that placed their documentary exhibits in context.

{¶80} The Ellises identified three expert witnesses who articulated the theory that in the case of G.E. and other children like him, hypoxic-ischemic encephalopathy ("HIE") could be caused by pressure exerted upon the head during labor by uterine contractions that they characterized as excessive. According to Dr. Barry Schifrin, one of the Ellises' experts, these excessive uterine contractions could increase cranial pressure to a degree that a baby's compensatory mechanisms could not overcome, resulting in decreased blood flow and, ultimately, damage to the brain caused by lack of oxygen.[1] Dr. Schifrin also opined that this type of injury, which he called cerebral compression ischemic encephalopathy, would not necessarily be reflected in blood gas levels taken from cord blood near the time of delivery. As applied to G.E.'s case, Dr. Schifrin suggested that CCIE would explain how G.E. could be diagnosed with HIE even if he did not meet generally accepted diagnostic criteria.

{¶81} The Ellises' experts acknowledged that CCIE is essentially a theory based on general principles that could provide an explanation for a mechanism of injury in cases that fall outside recognized parameters. Dr. Stephen Glass is a pediatric neurologist who participated in a poster presentation regarding CCIE with Dr. Schifrin in 2008, but who testified that he would not place the injury at issue in this case into that category. Describing that earlier presentation, he explained that it was "an earnest effort to present a concerning population of babies who presented with physical injuries as a consequence of similar patterns of labor and delivery, nothing more." Dr. Glass also testified that to the best of his knowledge, no follow-up work had been done regarding that presentation. He noted the historical presence of literature regarding trauma

---

[1] The parties relied on the depositions of numerous experts during the course of the *Daubert* proceedings. Although all of the expert reports were marked as deposition exhibits and referenced during the depositions, none of the exhibits were filed with the deposition transcripts. Consequently, this Court must rely upon the affidavits, depositions, and documentary evidence that were filed in the trial court without reference to expert reports, as it appears the trial court did.

following compression of the fetal skull but acknowledged that as a potential mechanism for fetal injury, it had been "overshadowed" by more recent developments in the field. Dr. Jeffrey Pomerance, another expert identified by the Ellises, disagreed with the proposition that CCIE is not accepted within the medical community, but could not point to any peer-reviewed literature that addressed it. Similarly, during his deposition testimony, Dr. Schifrin testified that the principles behind his theory were recognized but acknowledged that there is no literature demonstrating the point at which the degree and lack of blood flow to the brain can lead to injury in the way that he proposed.

{¶82} Dr. Fortner and Atrium moved to exclude all evidence premised upon CCIE under *Daubert.*[2] In support of their respective motions, one of the defendants explained the distinction between CCIE and the prevailing view of HIE with reference to G.E.'s case:

> There are mechanisms accepted by the medical community on how injuries to the neonatal brain occur. Reduction in blood flow to the fetus from the placenta and umbilical cord during labor is a well understood cause of neonatal encephalopathy. This causes systemic hypoxia in the fetus and acidemia in the umbilical cord blood.
>
> The problem for the plaintiffs is that *there is no evidence of systemic hypoxia in this case.* The umbilical cord blood was totally normal. This has forced Plaintiff's experts to concede that there was no systemic hypoxia causing injury to the brain of [G.E.].

(Emphasis in original). The defendants argued, with reference to the expert affidavits and documentary evidence submitted in support of their motions, that expert testimony premised upon CCIE was unreliable because it had not been tested; that it had not been subject to the process of publication and peer review and, consequently, that there is no data upon which a known or

---

[2] Dr. Christopher Rooney, M.D. and Aultman Hospital also moved to exclude the CCIE evidence, and their responses and evidentiary materials are part of the record that was before the trial court in deciding the motions.

potential rate of error could be calculated; and that CCIE is not only not generally accepted in the medical community but has, in fact, been rejected.

{¶83} In denying the *Daubert* motions, the trial court noted Dr. Schifrin's statement that although CCIE is a term coined by him and his associates, it represents "'[t]he notion of mechanical trauma causing injury to the fetal brain [which] has been an accepted notion throughout the specialties of obstetrics and pediatrics for centuries.'" The trial court also referenced the Ellises' experts' statements in support of this premise, but those statements refer to injuries caused by forces other than labor itself and to injuries other than HIE. In other words, those statements did not actually support the Ellises' position that CCIE is scientifically reliable.

{¶84} With respect to the *Daubert* factors, the trial court noted that, as the parties agreed, prospective studies related to CCIE on human subjects were ethically impossible. Noting several animal studies referenced by Dr. Schifrin, the trial court concluded that "[the Ellises'] experts proffer[ed] sufficient literature to support the theory that pressure to the fetal head can produce injury." The trial court further explained this general statement with reference to whether CCIE has been subject to peer review:

> Further, Dr. Schifrin identifies peer-reviewed research regarding (1) the use of pressure probes to measure amniotic fluid pressure and fetal head to cervix pressure; (2) human studies of cephalic-cervical pressure; (3) studies regarding elevations of fetal head to cervix forces; (4) measurements of actual intracranial pressure in fetuses that were deemed nonviable due to congenital hydrocephalus; (5) human studies regarding fetal cerebral oxygenation and blood flow during and in between contractions; (6) animal studies of cerebral blood flow during stimulated uterine contractions verses resting periods; and (7) animal studies of blood flow to heart and brain structures as a result of pressure applied to the fetal sheep skull. See 10/25/2017 Schifrin Affidavit at ¶¶34-38.

In other words, the trial court characterized the presence of these general principles in peer reviewed literature as evidence that CCIE has been subjected to peer review. As the evidence that accompanied the parties' filings demonstrates, however, CCIE is not a general theory. It does not

propose that pressure exerted on the fetal head from any source can produce injury of any kind. It proposes specifically that pressure exerted on the fetal head by labor itself can result in HIE by causing cranial pressure to increase to such magnitude that a baby's compensatory mechanisms cannot respond. The Ellises' experts proposed that injury can occur without the patient experiencing asphyxia or meeting the diagnostic criteria that are generally accepted in cases of HIE. Consequently, the presence of the general references in peer reviewed literature is not a substitute for the CCIE itself.

{¶85} The trial court noted that the parties agree that there is no known potential rate of error with respect to CCIE evidence. Because the expert testimony in this case does not pertain to a particular scientific technique, the known rate of error is not a consideration. *See Daubert*, 509 U.S. at 594. Nonetheless, the trial court determined that the literature referenced in its opinion indicated that the Ellises' expert opinions "'[had] been tested and examined in an objective manner.'" As noted above, however, the trial court's conclusion on this point does not relate specifically to CCIE, but to general references in the peer-reviewed literature.

{¶86} Finally, the trial court concluded that CCIE had gained general acceptance in the medical community based on the Ellises' identification of documentary evidence that supported some aspects of the theory. In so doing, the trial court also rejected reliance on the diagnostic standards promulgated by the American College of Gynecologists ("ACOG") and positions taken by ACOG in similar litigation as biased. In this respect, the testimony of the defendants' expert witnesses and the rejection of CCIE by ACOG is significant. Those witnesses, in some instances, admitted the theoretical possibility that CCIE *could* be a mechanism of injury regardless of their opinions of the likelihood of that result, but they also testified that the theory had not been subjected to sufficient scientific inquiry to gain acceptance in the medical community. Other

witnesses pointed to flaws in the methodology that had been employed thus far to describe CCIE. Dr. Jay Goldsmith, a member of the ACOG task force responsible for a revised publication in 2014 that considered HIE, testified that a paper describing CCIE was presented to the task force for consideration. According to Dr. Goldsmith, after informal review and consideration, the task force "decided that it did not meet the US Preventive Health Service Task Force criteria for levels of evidence, * * * so none of this was even discussed at a formal meeting. It was discussed informally and rejected because we did not think it was adequate science."

{¶87} Dr. Goldsmith's testimony related to a 2014 publication by ACOG and the American Academy of Pediatrics entitled "Neonatal Encephalopathy and Neurological Outcome." This publication updated the earlier work of the ACOG Task Force on Neonatal Encephalopathy and Cerebral Palsy, which published a report in 2003. Both publications set forth current research related to HIE and proposed standards for diagnosing HIE. The 2003 publication was endorsed by, among other entities and organizations, The United States Centers for Disease Control and Prevention, the March of Dimes, and the National Institute of Child Health and Human Development. The 2014 publication, which expanded the task force's consideration to neonatal encephalopathy more generally, was also endorsed by numerous organizations. Neither publication referenced CCIE, by name or otherwise.

{¶88} Consistent with the content of those publications, the defendants provided the trial court with documents that demonstrated that ACOG has affirmatively rejected CCIE because it has not been the subject of sufficient scientific inquiry. In his affidavit, however, Dr. Schifrin urged the trial court to disregard ACOG's position based on his articulation of bias on the organization's part:

> Finally, the Daubert challenge is carried out to take advantages within the legal
> system without dealing with certain realities of the medical community. ACOG is

devoted to inhibiting exposure to allegations of liability. To this end, a number of the publications dealing with the mechanism of fetal injury, especially during labor, have short-changed the subject. * * * Several quotes, a decade apart from frequent contributors to the obstetrical literature will underscore an approach that is directed at defending allegations of negligence and not enhancing patient care.

On the basis of Dr. Schifrin's statements, the trial court categorically rejected evidence related to ACOG as biased. Having reviewed the extensive documentary evidence filed by the parties on this issue, however, it is apparent that the defendants' position—and ACOG's concurrence in that position—cannot be dismissed so readily. The documentary record related to the *Daubert* challenges to CCIE in this case demonstrates that CCIE is essentially absent from the scientific literature that addresses neonatal encephalopathy and, in particular, HIE. This absence seems to be attributable to a lack of progress in research, not bias that can be attributed to ACOG or to any other organization.

{¶89} The heart of *Daubert*'s discussion of scientific knowledge and reliability is the scientific method. In that context, the United States Supreme Court has addressed the progress of science in relationship to the gatekeeping function of the courts:

> It is true that open debate is an essential part of both legal and scientific analyses. Yet there are important differences between the quest for truth in the courtroom and the quest for truth in the laboratory. Scientific conclusions are subject to perpetual revision. Law, on the other hand, must resolve disputes finally and quickly. The scientific project is advanced by broad and wide-ranging consideration of a multitude of hypotheses, for those that are incorrect will eventually be shown to be so, and that in itself is an advance. Conjectures that are probably wrong are of little use, however, in the project of reaching a quick, final, and binding legal judgment— often of great consequence—about a particular set of events in the past. We recognize that, in practice, a gatekeeping role for the judge, no matter how flexible, inevitably on occasion will prevent the jury from learning of authentic insights and innovations. That, nevertheless, is the balance that is struck by Rules of Evidence designed not for the exhaustive search for cosmic understanding but for the particularized resolution of legal disputes.

*Daubert*, 509 U.S. at 596-597. I acknowledge that, as noted above, this Court may only reverse a trial court's decision related to the exclusion of evidence under *Daubert* when there has been an

abuse of discretion. *See Kumho Tire Co., Ltd.*, 526 U.S. at 138-139. In this case, however, I conclude that the trial court abused its discretion by basing its decision on the presence of general principles in the scientific literature rather than on CCIE—which is a *specific* theory of causation. The trial court also abused its discretion by categorically disregarding Dr. Fortner and Atrium's evidence describing ACOG's diagnostic standards and its rejection of CCIE. I would emphasize, however, that my conclusion reflects a consideration of the trial court's gatekeeping role under Evid.R. 702(C), not a determination of whether the substance of the CCIE theory itself may ultimately be shown through scientific endeavor to have merit. *See Daubert* at 596-597.

{¶90} The concurring opinion concludes that although the trial court abused its discretion with respect to the admission of the expert testimony regarding CCIE, any resulting error is harmless. I cannot agree with this assertion. Civ.R. 61 explains application of the harmless-error doctrine in the context of civil cases:

> No error in either the admission or the exclusion of evidence * * * is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.

*See also* Evid.R. 103(A) ("Error may not be predicated upon a ruling which admits * * * evidence unless a substantial right of the party is affected[.]"). The Supreme Court of Ohio has explained that "'in order to find that substantial justice has been done to an appellant so as to prevent reversal of a judgment for errors occurring at the trial, the reviewing court must not only weigh the prejudicial effect of those errors but also determine that, if those errors had not occurred, the jury or other trier of the facts would probably have made the same decision.'" *Cappara v. Schibley*, 85 Ohio St.3d 403, 408 (1999), quoting *Hallworth v. Republic Steel Corp.*, 153 Ohio St. 349 (1950), paragraph three of the syllabus.

{¶91}  I cannot conclude from the record that the jury would have reached the decision that it did in the absence of CCIE evidence.  CCIE was the foundation of the Ellises' theory of causation.  Although the Ellises' experts addressed more than one theory regarding the mechanism of HIE at trial, the thread that unified their testimony was CCIE.  This testimony was not "shaky but admissible" evidence that met the standard of Evid.R. 702(C), and as the record demonstrates, it could not be effectively countered by "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof."  *See Daubert* at 596.  It is also not possible to conclude from the jury interrogatories that the jury relied on any theory other than CCIE in reaching its verdict.  To the contrary, the jury explained that one basis for its decision regarding Dr. Fortner's negligence was that her communication with Mrs. Ellis resulted in "prolonged protracted labor[,]" a reference that could specifically denote reliance upon Dr. Schifrin's expert testimony.

{¶92}  For these reasons, I would sustain Dr. Fortner and Atrium's first assignment, reverse the judgment of the trial court, and remand this matter for a new trial.

{¶93}  I concur with the lead opinion's disposition of the second assignment of error, but write separately to explain my rationale in doing so.  Dr. Fortner and Atrium's second assignment of error argues that the trial court abused its discretion by denying a second *Daubert* motion that sought to exclude "any and all evidence and/or testimony regarding Plaintiffs' causation theory that [G.E.]'s Autism Spectrum Disorder * * * was caused by events described by Plaintiffs as birth trauma, including, but not limited to, [HIE]."

{¶94} Dr. Fortner and Atrium[3] moved to exclude the testimony of Dr. Jeanette Wasserstein and Dr. Stephen Glass with respect to their opinions that there is a relationship between injuries that G.E. suffered at birth and the cognitive, developmental, and social impairments that G.E. now experiences.  More specifically, Dr. Fortner and Atrium framed that motion with respect to causation: they maintained that "[the Ellises] claim that [G.E.]'s ASD was proximately caused by HIE during labor and delivery[.]"  Based on this characterization, Dr. Fortner and Atrium argued that the theory that HIE causes ASD did not meet the threshold requirements for reliability established in *Daubert*.  In so doing, they relied on the testimony of their own expert witnesses, who opined that the most significant factor in the development of ASD is genetic and that there is no causal relationship between HIE and ASD.

{¶95}  As the trial court noted, however, the opinions expressed by Dr. Wasserstein and Dr. Glass were more nuanced than the characterization proposed by Dr. Fortner and Atrium.  In an affidavit filed along with the Ellises' response to the *Daubert* motion, Dr. Wasserstein explained her position:

> The list of journal articles and materials below are scientifically reliable, peer reviewed literature that show an established overlap of symptoms and impairments between pediatric patients that have suffered moderate brain injury from neonatal encephalopathy and those diagnosed as having ASD, including an association that pediatric patients with known brain injury from neonatal encephalopathy are significantly more likely to later be diagnosed as having ASD than children without neonatal encephalopathy.

In her affidavit, Dr. Wasserstein did not opine that G.E. experienced neonatal encephalopathy that caused him to develop ASD.  Instead, she explained that there is significant overlap between the impairments and behavioral characteristics that manifest as a result of neonatal brain damage and

---

[3] Dr. Rooney and Aultman also moved to exclude this evidence.  As with the *Daubert* motion addressed in the first assignment of error, their motions and the evidence submitted in support were considered by the trial court and are part of the record in this appeal.

those that meet the diagnostic criteria for ASD. Dr. Wasserstein explained that as a result, impairments and behaviors caused by neonatal brain damage could contribute to a *diagnosis* of ASD under the DSM-V diagnostic criteria. She also pointed to scientific literature that addressed observed correlations between moderate to severe neonatal encephalopathy and a later diagnosis of ASD and/or the development of impairments that were similar in character to those present in patients diagnosed with ASD.

{¶96} Dr. Stephen Glass also provided an affidavit that the Ellises filed in opposition to the *Daubert* motion. Like Dr. Wasserstein, Dr. Glass noted literature that "show[s] the strong, established symptom overlap of impairments between pediatric patients that have suffered moderate brain injury from neonatal encephalopathy and those later diagnosed as having ASD[.]" According to Dr. Glass, G.E. "has a diffuse brain injury originating in a neonatal encephalopathy, causing him disabling intellectual impairment, sensory and motor deficits, speech and language impairment, altered attention span, impaired social maturity, personal and adaptive skills, *all of which are present, entirely independent of a diagnosis of ASD.*" (Emphasis added.) Dr. Glass explained the relationship between the impairment that G.E. has and the diagnosis of ASD—with which Dr. Glass did not agree:

> [I]f [G.E.] does meet the DSM-V diagnostic criteria for ASD, the clustering of these various impairments and behaviors caused by his neonatal brain damage * * * would satisfy the thresholds of the DSM-V standard and thereby, put him at risk of being diagnosed with ASD.

(Emphasis in original.) Like Dr. Wasserstein, Dr. Glass did not express the opinion that ASD is *caused* by HIE in his affidavit, but the more nuanced opinion that an injury that G.E. suffered at birth resulted in deficits that could have played a part in that diagnosis.[4]

{¶97} With respect to that position, I cannot conclude that the trial court abused its discretion by denying Dr. Fortner and Atrium's *Daubert* motion addressing ASD. As the trial court observed, the Ellises and their experts directed the trial court's attention to peer-reviewed scientific literature describing the outcomes for children who suffer neonatal encephalopathy, noting the similarity between impairments seen in patients who suffered pediatric brain injury and children diagnosed with ASD, and observing the incidence of diagnosed ASD among those children. It is true that the Ellises did not point to scientific studies and peer reviewed publications demonstrating that HIE *causes* ASD. As explained above, however, that does not appear to be the basis of their expert opinions in the first instance. The literature to which the Ellises directed the trial court's attention does not consist of testing involving human subjects due to ethical considerations, but it does consist of data-driven reviews of medical records that satisfy the concerns addressed in *Daubert*. Because the expert testimony in this case does not pertain to a particular scientific technique, the "known or potential rate of error" is not a consideration. *See Daubert*, 509 U.S. at 594.

---

[4] The affidavits provided by Dr. Wasserstein and Dr. Glass also refer to relevant portions of their discovery depositions that were filed by the parties in support of their respective positions. In each case, the affidavit provides that the expert's opinions "were previously set forth[]" on the pages referenced. It appears that the trial court considered that deposition testimony in conjunction with—and not in isolation from—the affidavits, as this Court must also do. We are unable to consider the opinions expressed in Dr. Wasserstein's and Dr. Glass's expert reports because, although they were referenced in the *Daubert* motion filed by Dr. Rooney and Aultman, the reports were not filed.

{¶98} With respect to whether the Ellises' theory has gained general acceptance in the scientific community, this Court's review is limited in scope to the evidentiary materials that were before the trial court. In contrast to the *Daubert* motion with regard to CCIE, neither Dr. Fortner and Atrium nor Dr. Rooney and Aultman supported their *Daubert* motions with scientific literature that documented varying results or critiqued the methodology of the literature upon which the Ellises' experts relied. I would not go so far as to say that doing so is required in every case. In this case, however, the absence of such literature leaves this Court with no basis upon which I could conclude that the trial court abused its discretion by concluding that the theory espoused by the experts has gained general acceptance. This is particularly the case given that Dr. Fortner and Atrium's own experts acknowledged overlap between impairments that may result from traumatic pediatric brain injury and those that may be observed in children who have received a diagnosis of ASD.

{¶99} One point at which the experts in this case seem to disagree most vehemently appears to focus directly on G.E., the specific impairments that he manifests, and the relationship of injuries that he may have sustained at birth to those impairments. Notably, the Ellises' own experts disagreed with respect to G.E.'s diagnosis. Dr. Wasserstein determined that G.E.'s impairments aligned with a diagnosis of ASD and that G.E. should be diagnosed with ASD on that basis, but she also acknowledged that a diagnosis of ASD would not account for all of G.E.'s impairments. Dr. Glass, on the other hand, opined that G.E.'s impairments did not align with a diagnosis of ASD. Instead, he expressed the opinion that G.E.'s impairments were attributable to brain injury occurring near the time of his birth. The defendants' experts expressed a third opinion: that G.E.'s impairments support a diagnosis of ASD, which fully accounts for the nature of those impairments.

{¶100} The interconnectedness of this disagreement with the substance of the *Daubert* motion is highlighted by the fact that the parties drew attention to it throughout their respective briefs on the *Daubert* motion, each intermingling their arguments regarding the scientific reliability with arguments addressing the various conclusions reached by the expert witnesses. The parties have done so in their appellate briefs as well. Whether or not G.E. is properly diagnosed with a brain injury, ASD, or both, however, is beyond the scope of the *Daubert* motion, which is limited to the threshold determination of the scientific reliability of the basis for expert opinion. *See Nemeth*, 82 Ohio St.3d at 211.

{¶101} Because the expert opinions of Dr. Wasserstein and Dr. Glass met that threshold standard of reliability—and appear to be interconnected with questions of fact regarding G.E.'s diagnosis—the weight to be given their testimony was also a matter for consideration by the finder of fact. *See*, *e.g.*, *Daubert*, 509 U.S. at 595-596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."). The "conventional devices" of trial presentation and evaluation of the evidence according to the means provided by the Rules of Civil Procedure are "the appropriate safeguards where the basis of scientific testimony meets the standards" of Evid.R. 702. *See id.* at 596.

{¶102} Consequently, I would conclude that the trial court did not abuse its discretion by denying Dr. Fortner and Atrium's *Daubert* motion regarding ASD, and I would also overrule the second assignment of error.

APPEARANCES:

DOUGLAS G. LEAK, MICHAEL OCKERMAN, and W. BRADFORD LONGBRAKE, Attorneys at Law, for Appellants.

MICHAEL F. BECKER, HOLLY M. MOORE, and DAVID W. SKALL, Attorneys at Law, for Appellees.

PAUL W. FLOWERS and LOUIS E. GRUBE, Attorneys at Law, for Appellees.