# IN THE SUPREME COURT OF THE STATE OF DELAWARE

LAUREN E. SCOTTOLINE,  §
Individually, and as Parent and  §
Guardian of J.S.S., a Minor,  §  No. 48, 2024
and STEPHEN SCOTTOLINE,  §
Parent of J.S.S., a Minor,  §  Court Below: Superior Court
  §  of the State of Delaware
Plaintiffs Below,  §
Appellants,  §  C.A. No. N19C-08-135
  §
v.  §
  §
WOMEN FIRST, LLC,  §
and CHRISTIANA CARE  §
HEALTH SYSTEM, INC.,  §
  §
Defendants Below,  §
Appellees.  §

Submitted: March 18, 2025
Decided: June 18, 2025

Before **SEITZ**, Chief Justice; **VALIHURA**, **TRAYNOR**, **GRIFFITHS**, Justices, and **DAVID**, Vice Chancellor,[*] constituting the Court *en Banc*.

Upon appeal from the Superior Court. **AFFIRMED**.

Joshua J. Inkell, Esquire, THE INKELL FIRM, LLC, Wilmington, Delaware; Bartholomew J. Dalton, Esquire (*argued*), DALTON & ASSOCIATES, P.A., Wilmington, Delaware; Jeffrey M. Weiner, Esquire, LAW OFFICES OF JEFFREY M. WEINER, P.A., Wilmington, Delaware *for Plaintiffs Below, Appellants Lauren Scottoline, individually, and as Parent and Guardian of J.S.S., and Stephen Scottoline, Parent of J.S.S.*

---

[*] Sitting by designation under Del. Const. art. IV, § 12 and Supreme Court Rules 2(a) and 4(a) to complete the quorum.

Bradley J. Goewert, Esquire (*argued*), Thomas J. Marcoz, Jr., Esquire, BALAGUER MILEWSKI & IMBROGNO, Wilmington, Delaware; David Batten, Esquire, BATTEN MCLAMB SMITH, PLLC, Raleigh, North Carolina *for Defendant Below, Appellee Women First, LLC*.

John D. Balaguer, Esquire (*argued*), BALAGUER MILEWSKI & IMBROGNO, Wilmington, Delaware *for Defendant Below, Appellee Christiana Care Health System, Inc.*

**SEITZ**, Chief Justice, for the Majority:

In this appeal we review whether the Superior Court properly excluded an expert's causation opinion in a medical malpractice case. Applying Delaware Rule of Evidence 702, the court decided that the doctor's opinion – hypoxic-ischemic encephalopathy at birth caused a child's later neurological and behavioral impairments – was unreliable and therefore inadmissible. After careful consideration, we affirm the Superior Court's ruling.

I.

The facts are taken from the summary judgment record. On July 28, 2015, Lauren Scottoline gave birth to J.S.S. at Christiana Care Hospital. After birth, J.S.S. could not breathe on his own and had low blood-oxygen levels. His care team inserted a breathing tube. He soon began suffering seizures. Although his condition improved in the first week, six days after birth the physicians diagnosed J.S.S. with hypoxic-ischemic encephalopathy ("HIE"). He stayed in the newborn intensive care unit for three weeks before being discharged from the hospital.

J.S.S. began speaking before his first birthday, but he regressed and stopped speaking at eighteen months. He slowly developed one- or two-word phrases mixed with unintelligible sounds. Although J.S.S. began reading by his third birthday, he had difficulty paying attention at school. J.S.S.'s treating physicians found his developmental delays consistent with autism spectrum disorder ("ASD"). They

3

diagnosed J.S.S. with ASD in 2018. Doctors confirmed his ASD diagnosis when J.S.S. was reevaluated in 2021. Further testing revealed that J.S.S. is substantially delayed in speech, language, social responsiveness, comprehension, and expression compared to children his age.

Lauren Scottoline, individually and as J.S.S.'s parent and guardian, and Stephen Scottoline, as J.S.S.'s parent, filed suit against Christiana Care Health System, Inc. and Women First, LLC.[1] They claimed that the defendants were negligent during J.S.S.'s labor and delivery, which caused him harm.[2] In addition to other experts, the Scottolines retained Dr. Daniel Adler, a pediatric neurologist and causation and damages expert, and Jody Masterson, a registered nurse and life-care planning expert.

Through three reports and a deposition, Dr. Adler offered an opinion that J.S.S. had "neurological and neurodevelopmental disabilities and a behavioral syndrome that is within the autistic spectrum."[3] In her report, Masterson calculated J.S.S.'s lifetime care costs due to his disabilities. The defendants moved *in limine* to exclude their opinions and testimony at trial. In a series of decisions, the Superior

---

[1] Christiana Care Health System and Women First employed the medical staff that treated Lauren Scottoline and J.S.S. *See* App. to Pl.'s Opening Br. at A138, 140 [hereinafter A___] (Am. Compl. ¶¶ 10, 18).

[2] The negligence allegations were vigorously disputed by the defendants. Only for purposes of deciding this appeal do we assume that negligence occurred during J.S.S.'s delivery and birth.

[3] A145 (Dr. Adler's Second Report).

4

Court granted the motions *in limine*, denied the Scottolines' request for relief under Superior Court Rules of Civil Procedure 59 and 60, and granted the defendants' motion for summary judgment for lack of admissible causation testimony.[4]

## II.

The Scottolines make one central argument on appeal – the Superior Court ignored our decisions in the medical malpractice area by requiring Dr. Adler to have a reliable scientific basis and methodology for his opinions. Underlying this argument is another contention. They claim the court misunderstood Dr. Adler's opinion when it excluded his opinion that HIE caused ASD. To give context to the arguments, we review the medical diagnoses involved, the expert's reports, and then the Superior Court's March 1 and December 15 decisions.

## A.

Hypoxic-ischemic encephalopathy is a type of neonatal encephalopathy, a group of brain disorders in newborns.[5] HIE is caused by the lack of blood flow and oxygen to the brain.[6] It has many known causes, including genetic disorders,

---

[4] *See Scottoline v. Women First, LLC*, 2023 WL 2325701 (Del. Super. Ct. Mar. 1, 2023) [hereinafter *Mar. 1 Opinion*]; *Scottoline v. Women First, LLC*, 2023 WL 8678617 (Del. Super. Ct. Dec. 15, 2023) [hereinafter *Dec. 15 Order*]; *Scottoline v. Women First, LLC*, 2024 WL 385715 (Del. Super. Ct. Jan. 31, 2024).

[5] *See* A159 (Tr. 47–48, Dr. Adler Dep.).

[6] *See id.*

infection, environmental harm through the mother, and problems during labor and delivery.[7]

Autism spectrum disorder is a neurodevelopmental disorder.[8] These disorders are characterized by impaired development in "personal, social, academic, or occupational functioning."[9] ASD is marked by two key features: impaired social interactions and repetitive patterns of behavior.[10] The disorder is associated with various risk factors, but ASD does not have a known cause.[11]

Dr. Adler is a pediatric neurologist. He examined J.S.S. in 2019 and 2021 and reviewed his birth records. In his 2019 and 2021 expert reports, Dr. Adler concluded that HIE caused J.S.S.'s neurological and neurodevelopmental disabilities and behavioral syndrome within the autism spectrum.[12] To support his 2019 and 2021

---

[7] *See* A160 (Tr. 49–51, Dr. Adler Dep.).

[8] *See* Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 31 (5th ed. 2013) [hereinafter DSM-5]. The DSM-5 is the fifth edition of a reference manual used by healthcare professionals to diagnose mental disorders. It contains a list of mental disorders with associated diagnostic criteria.

[9] *Id.*

[10] *Id.* at 53.

[11] *See id.* at 56–57; *see also* App. to Appellees' Answering Br. at B148 [hereinafter B__] (Gabriela Foresti Fezer et al., *Perinatal Features of Children with Autism Spectrum Disorder* (2016)) ("The exact cause of autism spectrum disorder is unknown, but it is thought to be associated with an interaction of genes and environmental factors.").

[12] A062–63 (Dr. Adler's First Report) ("J.S.S. is a boy with neurological and neurodevelopmental disabilities. It is my medical opinion that all of J.S.S.'s neurological and neurodevelopental [sic] disabilities are the result of [HIE] . . . . In addition to his motor delays, J.S.S. has a behavioral syndrome that is characterized as autistic in nature. . . . While the causes of autism are diverse, in

opinions, Dr. Adler relied on his training and experience and four medical articles. He also relied on the American Psychiatric Association's diagnostic criteria for ASD in the DSM-5. The defendants moved *in limine* to preclude Dr. Adler from testifying at trial "that autism is caused, either as a general matter or specific to this case, by HIE."[13]

In its March 1, 2023 opinion, the Superior Court applied Delaware Rule of Evidence 702 and found that at least part of Dr. Adler's causation opinion – that HIE caused J.S.S.'s behavioral syndrome on the autism spectrum – was inadmissible on two grounds. First, the court held, it lacked a reliable scientific basis.[14] The court concluded that the literature Dr. Adler relied on did not identify HIE as a cause of ASD. At best, some of the articles "identif[ied] an association between HIE and ASD."[15] The court also concluded that "[s]tudies showing an association between two conditions are not, standing alone, sufficient evidence to support an opinion as to causation."[16]

---

this case, the cause of J.S.S.'s qualitative disturbance of social interaction and play is [HIE]."); *see* A144–46 (Dr. Adler's Second Report).

[13] A230 (Defs.' First Mot. *in Lim.*).

[14] *Mar. 1 Opinion* at *5–6.

[15] *Id.* at *5.

[16] *Id.*

7

Second, the court found that Dr. Adler's opinion was not the product of a reliable methodology. According to the court, "[w]hen a disease or disorder has several possible independent causes, an expert must 'employ a definitive scientific process to rule in and rule out' the many potential causes of the disorder before reaching a conclusion."[17] The court observed that Dr. Adler agreed "there is no scientific study showing a causal link between HIE and ASD," and that there are numerous potential causes of ASD, including genetic disorders.[18] It also found that Dr. Adler's reports "do not make any attempt to distinguish J.S.S.'s diagnosis and rule out those other potential causes."[19] Thus, the court held that "Plaintiffs are precluded from introducing at trial Dr. Adler's opinion or testimony that Hypoxic Ischemic Encephalopathy caused J.S.S.'s behavioral syndrome that falls within the autism spectrum."[20]

## B.

Following the March 1 decision, the court held a pretrial conference. The court questioned whether Dr. Adler would offer an opinion about the cause of J.S.S.'s

---

[17] *Id.* at *6 (quoting *Scaife v. Astrazeneca LP*, 2009 WL 1610575, at *16 (Del. Super. Ct. June 9, 2009)).

[18] *Id.*

[19] *Id.*

[20] *Id.* at *7.

neurological and neurodevelopmental disabilities unrelated to ASD.[21] The court left it to the parties to decide on next steps.[22]

On June 8, 2023, Dr. Adler submitted a third expert report. Dr. Adler stated that J.S.S.'s HIE was "significant and caused permanent brain damage."[23] He also stated that J.S.S.'s HIE caused brain injuries "consisting of motor impairment along with language, behavioral, cognitive and memory problems."[24] He followed that opinion with another that once again addressed ASD – J.S.S.'s "autism is part of an underlying hypoxic ischemic brain injury."[25] He relied on new medical references and gave more detail about his qualifications as a board-certified neurologist treating children with HIE. The defendants responded with another motion *in limine* to preclude Dr. Adler's opinions and testimony from his third report.

---

[21] A358 (Pretrial Conference, Mar. 10, 2023) (The court: "And what Dr. Adler's opinion, at least as I read it, doesn't break out is which of those permanent injuries are unrelated to the neurological conditions that fall within the autism spectrum, which I ruled are not in this case, so to speak.").

[22] *See* A361 (The court: "I would suggest that the parties go back and discuss sort of a procedure, a schedule for how you want to, as efficiently as possible, take this additional discovery and present a motion to me.").

[23] A376 (Dr. Adler's Third Report).

[24] *Id*.

[25] A378.

During oral argument on the motion *in limine*, the court revisited the question raised at the pretrial conference about the scope of Dr. Adler's opinions. The court asked whether he provided a "two-step" opinion:

> I think Dr. Adler, he sort of makes kind of a two-step diagnosis. In the first step, he says that because of the HIE, [J.S.S.] suffered certain neurological or other deficits, and then he says that, you know, when you look at those deficits in the DSM-5, they meet the criteria for ASD, and it's his opinion that it's ASD.
> Is that able to be parsed out into, you know, a diagnosis of certain disabilities or injuries on the one hand and then ASD on the other?[26]

The court asked the question to settle any "underlying confusion" about "what, if anything, was left to go forward."[27] The court continued: "it's clear that – it seems that the child has these neurological problems."[28] As the court saw it, the remaining dispute appeared to be about "what caused those neurological problems."[29] Defense counsel agreed, responding that the court had previously "left the door open" for the Scottolines to argue that some of J.S.S.'s disabilities "aren't characterized as ASD,

---

[26] A433 (Oral Argument Tr., Nov. 20, 2023).

[27] A434.

[28] A435.

[29] *Id.*

10

then parse that out."[30]  But, as the defendants argued, Dr. Adler "came back with the same opinion."[31]

The court asked the Scottolines' counsel whether it was "possible to parse that opinion of Dr. Adler."[32]  Counsel replied that "[a]utism is a parallel diagnosis with traumatic brain injury" and that "[m]any of the same symptoms of a traumatic [brain] injury from HIE are also found in autism."[33]  He continued that "the parallel issues of the neurological, developmental, and cognitive delays that are associated with autism are also associated with traumatic brain injury, or, in this case, HIE."[34]  Counsel also agreed that Dr. Adler's opinions in his third report were the same as his prior opinions.[35]  Counsel then turned to his main argument that the court's March 1

---

[30] A436 (Oral Argument Tr., Nov. 20, 2023).

[31] *Id.*

[32] A442.

[33] A443.

[34] A448.  Counsel's statement added to the confusion.  Counsel appears to have referred to the traumatic brain injury as HIE, rather than HIE causing traumatic brain injury.  *Cf.* A376 (Dr. Adler's Third Report) ("[T]he hypoxic-ischemic brain injury suffered by J.S.S. was significant and caused permanent brain damage.").

[35] A444 ("Well, [Dr. Adler] has essentially said the same thing over and over because he's sticking with his opinion.").

decision violated this Court's precedent,[36] and asserted that the court should reconsider its March 1 decision.[37]

On December 15, 2023, the Superior Court granted the defendants' motion. It held that Dr. Adler's causation opinion was "practically indistinguishable from the same causation opinion that the Court ruled inadmissible" in its earlier ruling.[38] Because Dr. Adler's opinions were "not materially different from or better supported than" his previous opinions, the court excluded them "for the same reasons set out in the Court's Memorandum Opinion."[39] With no causation opinion, the court later granted summary judgment to the defendants.

III.

Delaware Rule of Evidence 702 provides that qualified experts may offer opinions at trial if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the

---

[36] A447; *see also* A421 (Pls.' Resp. to Second Mot. *in Lim.* to Exclude Dr. Adler's Opinion) ("The issue before the Court is precisely the issue addressed by the Delaware Supreme Court in *Norman v. All About Women*.").

[37] *See* A431, A442–48 (Oral Argument Tr., Nov. 20, 2023).

[38] *Dec. 15 Order* at *4 ("Plaintiffs implicitly admit as much by their emphasis on *Norman*.").

[39] *Id.*

expert has reliably applied the principles and methods to the facts of the case.[40]

When applying the rule, Delaware courts look to the United States Supreme Court's opinion *Daubert v. Merrell Dow Pharmaceuticals, Inc.* and cases that follow it.[41] Expert testimony is admissible only if relevant and reliable.[42] The trial judge "acts as the gatekeeper" to bar expert testimony that fails this requirement.[43] On appeal, we review whether the Superior Court exceeded its discretion in its March 1 and December 15 motion *in limine* decisions.[44]

A.

We start with the Superior Court's March 1 ruling that "Plaintiffs are precluded from introducing at trial Dr. Adler's opinion or testimony that Hypoxic Ischemic Encephalopathy caused J.S.S.'s behavioral syndrome that falls within the

---

[40] D.R.E. 702 (2018).

[41] *See M.G. Bancorporation, Inc. v. Le Beau*, 737 A.2d 513, 522 (Del. 1999) ("[W]e hereby adopt the holdings of *Daubert* and *Carmichael* as the correct interpretation of Delaware Rule of Evidence 702.").

[42] *See Tumlinson v. Advanced Micro Devices, Inc.*, 106 A.3d 983, 991 (Del. 2013) ("[E]xpert opinion testimony is admissible 'only if it is both relevant and reliable'" (emphasis omitted) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999))).

[43] *Perry v. Berkley*, 996 A.2d 1262, 1267 (Del. 2010); *see Daubert v. Merrell Dow Pharmas., Inc.*, 509 U.S. 579, 589 (1993).

[44] *Hudson v. State*, 312 A.3d 615, 624 (Del. 2024) ("We review a trial court's decision to admit or exclude evidence for abuse of discretion." (citing *Miller v. State Farm Mut. Auto. Ins. Co.*, 993 A.2d 1049, 1053 (Del. 2010))).

autism spectrum."[45]  As their main argument on appeal, the Scottolines contend that the Superior Court "violated" our decisions in *Norman v. All About Women* and *Wong v. Broughton* by requiring medical literature to support a reliable scientific basis for expert opinions.[46]  According to the Scottolines, after *Norman* and *Wong*, a physician's expert opinion can be supported by a physician's training and experience and is "not required to be supported by literature" or a differential diagnosis.[47]

Norman and *Wong* addressed an expert's standard of care opinion in medical malpractice cases.  In those cases, we held that, at least when offering an opinion about the standard of care in birth and surgical procedures, a medical expert could rely on her training and experience.  Scientific literature was not required for the expert's opinion to be reliable under Rule 702.[48]

---

[45] *Mar. 1 Opinion* at *7.

[46] *See Norman v. All About Women, P.A.*, 193 A.3d 726, 731 (Del. 2018) ("[The expert] arrives at his opinions by applying his training and experience to the facts of this case. The information relied on by Dr. Soffer is clearly sufficient under D.R.E. 703 to justify admission of his opinions under D.R.E. 702."); *Wong v. Broughton*, 204 A.3d 105, 111 (Del. 2019).

[47] Opening Br. of Appellant at 6 [hereinafter Opening Br.].

[48] *Norman*, 193 A.3d at 729 (reviewing whether a doctor breached the standard of care by using "sloppy" surgical technique, and "not identifying and treating the perforation of [the patient's] bladder"); *Wong*, 204 A.3d at 108 (reviewing whether a doctor breached the standard of care by using "excessive lateral traction" and injuring the patient's right arm).  There has been criticism after *Daubert* about courts allowing a medical expert to rely solely on credentials and experience instead of closely examining the substance of the opinion.  *See, e.g.*, Monica Lynne Coscia, Note, *"Trust Me, I'm a Doctor": Medical Malpractice as a* Daubert-*Free Zone*, 108 Geo. L.J. 1761, 1777–78 (2020) ("Several experts who are objectively unqualified under *Daubert* have been allowed to testify in medical malpractice cases. . . . In cases like these, admissibility

14

Here, the equivalent would be Dr. Adler relying on his experience as a pediatric neurologist to testify that the medical professionals overseeing J.S.S.'s birth breached the standard of care during J.S.S.'s delivery. Dr. Adler, however, disclaimed a standard of care opinion.[49] Instead, his opinion ventured into scientific inquiry – did J.S.S.'s HIE cause his ASD? In other words, what was the etiology of J.S.S.'s ASD?[50]

Dr. Adler is an accomplished pediatric neurologist with impressive credentials and years of experience diagnosing pediatric neurological conditions. Yet "[t]he ability to diagnose medical conditions is not remotely the same . . . as the ability to deduce . . . in a scientifically reliable manner, the causes of those medical conditions."[51] "For most physicians, attributing background causation is not part of their normal practice."[52] A physician "may testify to both, but the reliability of one

---

determinations turn on who the experts are—their experiences, knowledge of industry custom, and similarity to the defendant—rather than the substance of their testimony.").

[49] A155 (Tr. 31, Dr. Adler Dep.) ("Q. And you're not offering any standard of care opinions in this case, correct? A. Correct.").

[50] A disease's diagnosis is different than its etiology. A diagnosis is an explanation for a patient's symptoms. For example, a flu diagnosis explains a high fever, aches and pains, fatigue, and a runny nose. Etiology addresses the cause of a diagnosed disease. In the case of the flu, a virus.

[51] *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 674 (6th Cir. 2010) (quoting *Gass v. Marriott Hotel Servs., Inc.*, 501 F. Supp. 2d 1011, 1019 (W.D. Mich. 2007), *rev'd on other grounds*, 558 F.3d 419 (6th Cir. 2009)).

[52] Joseph Sanders et al., *Differential Etiology: Inferring Specific Causation in the Law from Group Data in Science*, 63 Ariz. L. Rev. 851, 860 (2021); *see* 3 David L. Faigman et al., *Modern Scientific Evidence* § 21:1 (updated ed. 2024) [hereinafter *Modern Scientific Evidence*] ("[T]raining in the process of *deducing disease* based on a set of symptoms and laboratory tests and deducing the

15

does not guarantee the reliability of the other."[53]  Dr. Adler's expertise diagnosing neurological conditions or diseases does not guarantee expertise with etiology. When expressing a causation opinion, Dr. Adler was required to demonstrate that the etiology opinion he deduced – J.S.S.'s HIE caused his ASD – was reliable.

Dr. Adler failed to show that his etiology opinion had a scientific basis. Although he cited medical literature, he agreed that the medical literature he relied on suggested only an *association* between brain injury and autism – meaning, "related to each other but not necessarily linked in terms of cause."[54]  He was not aware of any published medical studies or literature demonstrating that HIE causes ASD.[55]  Dr. Adler also failed to reference personal experience in deducing etiologies. Without academic literature or etiological experience demonstrating that HIE can

---

*cause* of an ailment, are not the same thing. Many physicians may have far less training in the latter task."); *see also* Edward J. Imwinkelried, *The Admissibility and Legal Sufficiency of Testimony About Differential Diagnosis (Etiology): Of Under—And Over—Estimations*, 56 Baylor L. Rev. 391, 405 (2004) ("In short, an expert physician's opinion about the nature of an illness, based on a differential diagnosis, might well be more reliable than the same physician's opinion about causation, arrived at by differential etiology.").

[53] *Tamraz*, 620 F.3d at 674.

[54] A171 (Tr. 93, Dr. Adler Dep.); *see also Wilant v. BNSF Ry. Co.*, 2020 WL 2467076, at *7 (Del. Super. Ct. May 13, 2020) (finding that, based on the literature reviewed, "association and causation are different conclusions"), *partially vacated on other grounds*, 2020 WL 3887881 (Del. Super. Ct. July 9, 2020).

[55] A172 (Tr. 99–100, Dr. Adler Dep.).  We agree with the Superior Court's finding that Dr. Adler's literature only identified "an association between HIE and ASD." *Mar. 1 Opinion* at *5.

cause ASD, Dr. Adler's expert opinion lacked a scientific basis and was therefore inadmissible.

The Scottolines maintain that Dr. Adler's HIE-ASD causation opinion was still reliable because his third report used the "magic words" "differential diagnosis," thereby employing a reliable methodology.[56] As explained earlier, however, the issue is not with Dr. Adler's *diagnosis* but with his *etiology* opinion that HIE caused ASD. The "process-of-elimination" method by which an expert demonstrates causation is more precisely called a differential etiology.[57] A differential etiology requires the expert to rule in plausible causes for a diagnosis and rule out alternative causes.

Once again, Dr. Adler failed to demonstrate that his opinion was reliable. He acknowledged that there are a "whole host of potential causes" for ASD,[58] but did

---

[56] Opening Br. at 3.

[57] *C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 832 n.4 (7th Cir. 2015); *accord McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995) ("Fagelson based his opinion on a range of factors, including . . . use of a scientific analysis known as differential etiology (which requires listing possible causes, then eliminating all causes but one)"); *Hendrix ex rel. G.P. v. Evenflo Co.*, 609 F.3d 1183, 1195 (11th Cir. 2010) ("Differential etiology is a medical process of elimination whereby the possible causes of a condition are considered and ruled out one-by-one, leaving only one cause remaining."); *see also* Fed. Jud. Ctr., *Reference Manual on Scientific Evidence* 617 (3d ed. 2011) ("In a differential etiology, an expert first determines other known causes of the disease in question and then attempts to ascertain whether those competing causes can be 'ruled out' as a cause of plaintiff's disease . . . ."); Restatement (Third) of Torts: Phys. & Emot. Harm § 28 cmt. c (Am. L. Inst. 2010) ("Assessing whether other causes can be ruled out (or in) as potential causes of a plaintiff's disease can provide probative evidence of specific causation. This technique is more accurately described as a 'differential etiology.'").

[58] A174 (Tr. 106, Dr. Adler Dep.).

17

not adequately rule out other known causes. For example, Dr. Adler claimed that Lauren Scottoline's medical history showed nothing that would cause "any concern about her unborn child."[59] Yet he admitted that he did not know which maternal history factors were associated with an increased risk of ASD.[60] Dr. Adler acknowledged that genetic disorders are a potential cause of ASD.[61] But he admitted that, if J.S.S. had received genetic testing, he had not seen the results.[62] At bottom, Dr. Adler did not perform a differential etiology for J.S.S.'s ASD diagnosis. By not attempting to rule out other possible causes, Dr. Adler did not apply a reliable methodology to support his causation opinion.[63] The Superior Court properly excluded his opinion and testimony that HIE caused J.S.S.'s behavioral syndrome that fell within the autism spectrum.[64]

---

[59] A173 (Tr. 104, Dr. Adler Dep.).

[60] *Id.* (Tr. 101–02, Dr. Adler Dep.).

[61] A172 (Tr. 100, Dr. Adler Dep.).

[62] A183 (Tr. 141, Dr. Adler Dep.).

[63] *See Minner v. Am. Mortg. & Guar. Co.*, 791 A.2d 826, 854 (Del. Super. Ct. 2000) ("The fatal flaw in [the expert's opinion] is that she refused to adequately consider, and eliminate, other possible causes of the Plaintiffs' illnesses through a definitive scientific process."); *see also Pugh v. Cmty. Health Sys., Inc.*, 2023 WL 3361166, at *13 (E.D. Pa. May 10, 2023) (excluding the expert opinion as unreliable because "she does not sufficiently outline a methodology addressing equivocal or inconsistent findings to her own"), *aff'd sub nom.*, *Pugh v. Northampton Hosp. Co., LLC*, 2024 WL 3581171 (3d Cir. July 30, 2024).

[64] The Scottolines call our attention to *Ellis v. Fortner*, 169 N.E.3d 987 (Ohio Ct. App. 2021). In *Ellis*, an intermediate appellate court affirmed a trial court decision admitting an expert opinion that HIE can cause ASD. Two points distinguish how it applies here. First, like here, the appellate court reviewed for abuse of discretion, which affords the trial court substantial leeway in its

18

B.

We turn next to the Superior Court's December 15 ruling excluding Dr. Adler's opinions in the third report.  Dr. Adler concluded in his first two reports that J.S.S.'s neurological and neurodevelopmental disabilities and behavioral syndrome within the autism spectrum were caused by HIE during his labor and delivery.  The court excluded Dr. Adler's HIE-ASD opinion but observed that his reports did not "break out" which of his injuries were unrelated to ASD.[65]  In his third report, Dr. Adler stated that HIE caused J.S.S.'s motor impairments and neurological problems.  He also stated that J.S.S.'s ASD was part of his "underlying" HIE injury.[66]

It is unclear whether Dr. Adler meant to express two related but separate opinions in his reports – first, that J.S.S.'s HIE caused certain neurological and neurodevelopmental disabilities; and second, that J.S.S.'s HIE caused behavioral disabilities, some of which are consistent with an ASD diagnosis.[67]  But even if we found that he did, his opinions still did not clear the *Daubert* threshold.

---

*Daubert* decision.  Second, unlike here, the Ohio trial court concluded that the causation theory had gained "general acceptance" based on "the articles provided by the Ellises and the opinions expressed by G.E.'s treating physicians."  *Id.* at 995.  The scientific literature in *Ellis* was not cited by Dr. Adler in his reports.

[65] A358 (Pretrial Conference, Mar. 10, 2023).

[66] A378 (Dr. Adler's Third Report).

[67] Part of our confusion stems from Dr. Adler's reversion to an ASD diagnosis.  The Superior Court in its March 1 decision precluded Dr. Adler from expressing opinions and testifying that HIE causes ASD.  Yet Dr. Adler continued to express the same opinions in his third report.

As explained earlier, diagnosis expertise does not equate to etiology expertise. Dr. Adler was qualified to diagnose J.S.S. with HIE and with neurological, neurodevelopmental, and behavioral disabilities. When it comes to etiology, however, Dr. Adler simply stated a conclusion and repeated it in the report – that J.S.S.'s "hypoxic-ischemic-brain injury has caused permanent brain injury consisting of motor impairment along with language, behavioral, cognitive and memory problems."[68] His etiology opinion without explanation is unreliable.[69]

Dr. Adler did point to medical literature stating that "cognitive deficits may occur" after HIE at birth,[70] and children who experienced HIE are "at increased risk of cognitive deficits."[71] Those statements, though equivocal, might have been sufficient as a general matter to draw a connection between HIE and other neurological disorders. But he failed to support his opinion *specifically to J.S.S.* with anything other than *ipse dixit* – that J.S.S.'s HIE at birth caused his neurological and neurodevelopmental disabilities.[72]

---

[68] A376 (Dr. Adler's Third Report).

[69] *See* 5 Michael H. Graham, *Handbook of Federal Evidence* § 702:1 (updated 9th ed. 2024).

[70] A377 (Dr. Adler's Third Report) (citing B134 (Joseph J. Volpe, *Neonatal Encephalopathy: An Inadequate Term for Hypoxic-Ischemic Encephalopathy* (2012))).

[71] *Id.* (citing B140 (Linda S. de Vries & Marian J. Jongmans, *Long-Term Outcome After Neonatal Hypoxic-Ischaemic Encephalopathy* (2010))).

[72] *See Minner*, 791 A.2d at 851 ("An opinion cannot be based simply on the *ipse dixit* of the expert." (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert*

There are many possible causes of a child's neurological and neurodevelopmental disabilities.[73] Although an expert need not eliminate all other causes to conduct a reliable differential etiology, an expert must at least exclude obvious alternatives.[74] At best, Dr. Adler in his third report attempted to rule out other causes for J.S.S.'s behavioral syndrome on the autism spectrum – an opinion already precluded by the March 1 ruling and that we affirmed. The Superior Court did not err in excluding opinions and testimony from Dr. Adler's third report.

## IV.

Next, the Scottolines argue that the Superior Court erred by denying their motion for an evidentiary hearing because Dr. Adler's "opinions and his

---

or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."))).

[73] *See, e.g.*, DSM-5 at 33 ("Examples include genetic disorders, such as fragile X syndrome, tuberous sclerosis, and Rett syndrome; medical conditions such as epilepsy; and environmental factors, including very low birth weight and fetal alcohol exposure (even in the absence of stigmata of fetal alcohol syndrome)."); B340 (Joseph J. Volpe, *Volpe's Neurology of the Newborn* (2018)) ("A large corpus of clinical, epidemiological, and experimental studies show that appropriate nutrition during the premature period is important for neurodevelopmental outcome and that postnatal undernutrition is deleterious." (emphasis omitted)). *See generally* B290–301 ((Joseph J. Volpe, *Volpe's Neurology of the Newborn* (2018)) (discussing disorders of brain development from the fifth month of gestation to several years after birth that affect neurodevelopmental outcomes).

[74] *Cf. State v. McMullen*, 900 A.2d 103, 117 (Del. Super. Ct. 2006) ("A differential diagnosis is deemed reliable for *Daubert* purposes if it is rendered after the physician conducts a physical examination, takes a medical history, reviews clinical tests, including laboratory tests, and excludes *obvious* (but not all) alternative causes." (citing *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 156 (3d Cir. 1999) ("A medical expert's causation conclusion should not be excluded because he or she has failed to rule out every possible alternative cause of a plaintiff's illness."))). *See generally* 3 *Modern Scientific Evidence* § 21:4 ("[M]any courts are sensitive to the limits of even the best differential etiology analyses and do not require the expert to eliminate every other cause before being permitted to testify.").

methodology have not fully been developed on the record."[75]  The trial court has broad discretion to decide how to fulfill its gatekeeping duties.[76]  It decides "what proceedings, if any, are needed to investigate reliability."[77]  "[A]bsent a special reason and need to have the hearings, requests for them should generally be denied."[78]

The Superior Court did not exceed its discretion by deciding not to hold an evidentiary hearing.  Dr. Adler issued two reports and then a third report after the court excluded the initial ones.  He also sat for a deposition.  The parties briefed two *Daubert* motions which were heard at oral argument.[79]  It was within the court's discretion to decide that the Scottolines had "ample opportunity to develop a record that passes *Daubert* muster."[80]

---

[75] Opening Br. at 31.

[76] *Hudson*, 312 A.3d at 629 (citing *Minner*, 791 A.2d at 845).

[77] *Minner*, 791 A.2d at 845 (quoting 4 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 702.5[2][a] (Joseph M. McLaughlin ed., 2d ed. 1997)); *see Hudson*, 312 A.3d at 629 ("As long as the trial judge can gather sufficient information to fulfill its gatekeeping duties, the form of the proceeding is within their discretion."); *accord Kumho Tire Co.*, 526 U.S. at 152.

[78] *Minner*, 791 A.2d at 845.

[79] *See* A250–310 (Oral Argument Tr., Dec. 16, 2022); A428–52 (Oral Argument Tr., Nov. 20, 2023).

[80] *Dec. 15 Order* at *4.  The Scottolines argue that the defendants did not depose Dr. Adler a second time.  It was not, however, the defendants' burden to demonstrate that Dr. Adler's report was admissible.  *See Bowen v. E.I. DuPont de Nemours & Co., Inc.*, 906 A.2d 787, 795 (Del. 2006) ("The party seeking to introduce the expert testimony bears the burden of establishing its admissibility by a preponderance of the evidence.").  The Scottolines also rely on *State v. McMullen* to argue that trial courts hold evidentiary hearings when the opposing party questions

The Scottolines also contend that Dr. Adler's third report was substantially different than the first two reports. As explained above, we find the opinions expressed in the three reports to be unreliable and therefore inadmissible. We agree with the Superior Court that it had a fully developed record to consider the admissibility of Dr. Adler's opinions and testimony. The court was within its discretion to deny an evidentiary hearing.

V.

Finally, we briefly address the Scottolines' remaining arguments. They claim that the Superior Court erroneously excluded Masterson's opinion and testimony. But the Scottolines concede that Masterson's opinion "is premised on the opinion of Dr. Adler."[81] Because Dr. Adler's testimony was properly excluded, Masterson's testimony was properly excluded as derivative of Dr. Adler's.

The Scottolines also argue that the court should have granted their supposed motion under Superior Court Rule of Civil Procedure 60 because the court overlooked our *Norman* and *Wong* decisions. We question whether Rule 60 was properly raised without a formal motion and whether it was the proper procedural

---

an expert's methodology. 900 A.2d 103. But in *McMullen*, the Superior Court did not explain why an evidentiary hearing was ordered. The court merely stated that "[a] hearing was held on May 3, 2006." *Id.* at 107. The Scottolines fail to explain why *McMullen* is applicable here. They are correct that a court *may* hold an evidentiary hearing to develop disputed expert testimony. But that does not determine whether a trial court *should* hold an evidentiary hearing.

[81] Opening Br. at 32.

vehicle to bring long-standing precedent to the court's attention.  As the Superior

Court observed, a timely motion for reargument would have been a better fit.  In any

event, we have addressed above why *Norman* and *Wong* do not change the Superior

Court's decision.

VI.

We affirm the Superior Court's judgment.

**VALIHURA, J.,** dissenting:

I respectfully dissent from the Majority's opinion on two primary points: the Majority's characterization of Plaintiffs' claim and Dr. Adler's expert opinion, and its treatment of this Court's controlling case law in *Norman* and *Wong*.

From the beginning of this case, Plaintiffs have framed their claim as one in which medical negligence during Lauren Scottoline's labor and delivery of J.S.S. caused J.S.S. to be deprived of oxygen during birth, resulting in tissue and organ damage, including a permanent Hypoxic Ischemic Encephalopathy injury to the brain. Nowhere does the complaint allege that negligent medical care or a resulting birth injury caused his autism.

On July 28, 2015, minor child J.S.S. was born at Christiana Hospital with "no respiratory effort" and falling blood oxygenation levels.[1] He was intubated within five minutes of birth, experienced seizures approximately twenty minutes after his birth, and was diagnosed with Hypoxic Ischemic Encephalopathy ("HIE") six days after his birth. The treating neurologist's and neonatologist's records indicated that he was "extremely sick" and that initial testing was "consistent with severe encephalopathy."[2] Although J.S.S. initially appeared to recover, spoke before his first birthday, and began walking at sixteen months, by eighteen months, he had stopped speaking and was regressing. At twenty months, his behavioral pediatrician noted that he had "developmental delays in all areas"

---

[1] *Scottoline v. Women First, LLC*, 2023 WL 2325701, at *1 (Del. Super. Mar. 1, 2023). Except where otherwise noted, the background facts in this opinion are taken from the Superior Court's first memorandum opinion. *Id.*

[2] *Id.*

with physical therapy, occupational therapy, speech therapy, and early childhood education being provided, but that she was not "struck" with the impression of autism.[3] In May 2018, J.S.S. was "diagnosed" with educational Autism Spectrum Disorder ("ASD") by his school district so that he could receive additional support services. He was reevaluated in February 2021, and his physicians found his developmental delays consistent with ASD.

Plaintiffs filed this action on August 15, 2019, on behalf of J.S.S. and Lauren Scottoline, his mother. The amended complaint was filed on March 2, 2021, and alleged that Defendant-Appellees provided negligent medical care while Lauren Scottoline was hospitalized and during her delivery of J.S.S. This negligent care included failing to be readily available to respond to requests to provide obstetrical care for Lauren Scottoline during her labor and delivery, failing to properly manage and monitor her labor and delivery knowing she was a high-risk patient, failing to request or otherwise take steps to have a medical doctor present at her bedside despite many periods of non-reassuring fetal status during her labor, and failing to ensure that necessary equipment was available during the second stage of her labor including a functioning fetal scalp electrode.[4] The complaint further alleges that the negligence proximately caused J.S.S.'s HIE during the labor and delivery process, resulting in permanent harm including physical injuries, damage to his organs and muscles, and neurological and neurodevelopmental disabilities.[5] The complaint

---

[3] App. to Opening Br. at A487–88 (Developmental Follow-Up Report on April 4, 2017) (noting fair eye contact, no obvious repetitive behaviors, and her concern that his delays were more global).

[4] *Id.* at A139, A141 (Complaint at ¶¶ 11, 20).

[5] *Id.* at A139–40 (Complaint at ¶¶ 13–14).

2

also alleges that an earlier delivery of J.S.S. would have prevented his injuries and the neurological and neurodevelopmental disabilities he now experiences.[6] The complaint does not allege that the negligence caused autism or even use the word "autism."

Plaintiffs engaged an expert, Dr. Daniel Adler, whose opinion was offered to prove causation and damages. There is no dispute that Dr. Adler is a well-qualified medical expert.[7] He has been "fully trained in Neurology with Special Competence in Child Neurology since 1980" and "Board Certified in this specialty since 1982."[8] In his forty-one years of experience, he has seen numerous children with brain damage due to neonatal HIE and numerous children with autism, and he has provided treatment for those children as they aged.

Dr. Adler examined J.S.S. three times, reviewed his medical history and records, and ultimately issued three reports offering his expert opinion. In his first report, Dr. Adler clearly opined that "all of J.S.S.'s neurological and neurodevelopmental disabilities are the result of the hypoxic ischemic brain injury that J.S.S suffered during the labor and delivery process."[9] Dr. Adler also stated that "[a]n earlier delivery would have significantly mitigated if not wholly and totally prevented the neurological and neurodevelopmental

---

[6] *Id.* at A140 (Complaint at ¶¶ 15–17).

[7] The Superior Court acknowledged the lack of dispute as to Dr. Adler's expert qualifications. *Scottoline*, 2023 WL 2325701, at *5 ("Defendants do not contest that Dr. Adler is a well-qualified expert.").

[8] *Id.* at A376 (Dr. Adler's Third Expert Report).

[9] *Id.* at A62–63 (Dr. Adler's First Expert Report).

disabilities that J.S.S. suffers from."[10] He further opined that J.S.S.'s injuries from his birth were permanent and would prevent him from ever being educated in a conventional classroom without support, employed in the competitive job market, able to live independently, or to live without extraordinary medical care.[11] Although Dr. Adler offered additional support in his later reports in the form of medical literature in an attempt to address criticism by Defendant-Appellees, the basic substance of his medical opinion and report remained consistent.[12]

Dr. Adler also stated essentially the same opinion in his deposition. Even when pressed repeatedly about whether he agreed that J.S.S. had autism or that HIE could cause ASD, Dr. Adler's medical opinion was clear: "I think in this case where there was a moderate encephalopathy – and we have gone through all of the criteria; I don't need to repeat them – I believe that the perinatal events are the competent producing cause of all of [J.S.S.]'s neurological and neurodevelopmental disabilities, his motor issues, his cognitive impairment, his language issues and his behavioral problems."[13] Although Dr. Adler did acknowledge J.S.S.'s autism diagnosis and did not dispute it, he consistently

---

[10] *Id.* at A63.

[11] *Id.*

[12] Dr. Adler's expert medical opinion was clearly restated in his second report: "It remains my medical opinion that all of J.S.S.'s neurological and neurodevelopmental disabilities are the result of the hypoxic ischemic brain injury that J.S.S. suffered during the labor and delivery process." *Id.* at A145. His opinion was clearly restated again in his third report: "It remains my medical opinion within a reasonable degree of medical probability that all of the neurological and neurodevelopmental disabilities of J.S.S. are the result of a hypoxic-ischemic brain injury." *Id.* at A379.

[13] *Id.* at A169–70 (Dr. Adler Deposition Transcript).

4

framed his opinion that it was his medical opinion that J.S.S. sustained an HIE brain injury at birth and that injury was the cause of all of J.S.S.'s underlying neurological and neurodevelopmental disabilities, some of which also met the criteria for an ASD diagnosis.

I turn now to the Superior Court's exclusion of Dr. Adler's expert opinion. This Court reviews evidentiary rulings for an abuse of discretion.[14]

Delaware Rule of Evidence 702 states that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case." [15]

This Court in *Bowen v. E.I. DuPont de Nemours & Co., Inc.* adopted the federal five-step *Daubert* test for determining the admissibility of expert witness testimony under D.R.E. 702, which requires the trial judge to determine whether:

> (1) the witness is qualified as an expert by knowledge, skill, experience, training, or education;
>
> (2) the evidence is relevant;

---

[14] *Hudson v. State*, 312 A.3d 615, 624 (Del. 2024) ("We review a trial court's decision to admit or exclude evidence for abuse of discretion.") (citing *Miller v. State Farm Mut. Auto. Ins. Co.*, 933 A.2d 1049, 1053 (Del. 2010); *Bowen v. E.I. DuPont de Nemours & Co.*, 906 A.2d 787, 795 (Del. 2006)).

[15] D.R.E. 702.

5

(3) the expert's opinion is based upon information reasonably relied upon by experts in the particular field;

(4) the expert testimony will assist the trier of fact to understand the evidence or to determine a fact in issue; and

(5) the expert testimony will not create unfair prejudice or confuse or mislead the jury.[16]

In applying this *Daubert-Bowen* test for the admissibility of expert evidence, trial courts act as gatekeepers rather than factfinders, focused on whether the proffered evidence is "relevant" and "reliable" rather than whether the conclusions the expert has drawn are accurate.[17] The trial court has "'broad latitude' to determine whether any or all of the *Daubert* factors are 'reasonable measures of reliability in a particular case[.]'"[18] As *Daubert* makes clear, cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking questionable but admissible evidence.[19] The trial court's function is to act as gatekeeper, not to decide which expert's opinion is correct or more credible. In other words, the main function is to keep junk science from the jury.

In the context of medical negligence cases, this Court recently recognized in *Norman* a "strong preference" for admitting expert opinions "when they will assist the trier

---

[16] *Bowen*, 906 A.2d at 795.

[17] *Daubert*, 509 U.S. 579, 597 (1993).

[18] *General Motors Corp. v. Grenier*, 981 A.2d 531, 536 (Del. 2009) (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999)).

[19] *Id.* at 590.

6

of fact in understanding the relevant facts or the evidence."[20]  In *Norman*, a plaintiff brought a medical negligence action against her treating physician after her bladder was punctured during a diagnostic laparoscopy.[21]  The defendants in that case filed a motion *in limine* to exclude the plaintiff's expert opinion on the ground that it lacked the requisite reliability under the third prong of the *Daubert-Bowen* test and settled Delaware case law.[22] The Superior Court in *Norman* agreed, "noting that Ms. Norman failed to meet her burden because no evidence was presented that [the expert]'s opinion was 'based on information reasonably relied upon by experts in the field.'"[23]  This Court was assessing the third *Daubert* factor.[24]

We first noted that the Superior Court "appears to have interpreted this factor to require that the expert's opinion be based upon medical literature or peer reviewed publications or some other source which corroborates the expert's analysis."[25]  The Superior Court deemed an opinion by a doctor "based on his own knowledge" to be insufficient.[26]  We noted that the physician expert, Dr. Soffer, arrived at his opinions by "applying his training and experience to the facts of this case" and then stated that "[m]edical literature or peer reviewed publications may be useful factors in an appropriate

---

[20] *Norman v. All About Women, P.A.*, 193 A.3d 726, 730 (Del. 2018).

[21] *Id.* at 727–28.

[22] *Id.* at 728.

[23] *Id.* at 729.

[24] *Id.* at 731.

[25] *Id.*

[26] *Id.*

7

case, and may be relevant to the defense in this case, but they have no bearing on the admissibility of Dr. Soffer's opinions."[27]  Although the issues on appeal in *Norman* were framed primarily as standard of care issues, this Court recognized that the expert opinion was given in two parts and that the first part "attribute[d] the *cause* of the perforation of Ms. Norman's bladder to the placement of a secondary trocar."[28]  The expert based his opinion on the medical records provided by the hospital that did the corrective surgery and his own experience.[29]  This Court ultimately concluded: "Dr. Soffer's deposition testimony, *considered as a whole*, is sufficient to establish the applicable standards of care, Dr. Maynard's deviations from those standards, *and injury to Ms. Norman caused by those deviations*.  His testimony is admissible."[30]

A year later in *Wong*, this Court affirmed the Superior Court in admitting expert testimony after the appellees contended "that [the medical expert] failed to base his opinion on information reasonably relied upon by experts in his field, thus not meeting the requirements of *Daubert*, *Bowen*, and Delaware Rule of Evidence 702."[31]  First noting that the physician expert in *Wong* testified based on twenty years of experience in the field and observations of the patient in the case, this Court found that his "opinion was sufficiently based upon the facts of this case to satisfy Rule 702."[32]  Finally, noting the appellees' final

---

[27] *Id.*

[28] *Id.* (emphasis added).

[29] *Id.* at 731–32.

[30] *Id.* at 732 (emphasis added).

[31] *Wong v. Broughton*, 204 A.3d 105, 111 (Del. 2019).

[32] *Id.*

8

argument that the expert's testimony was not based on information reasonably relied upon by experts in his field because he failed to cite any literature for excluding other possible causes of the patient's injury, this Court restated its rule from *Norman* that "the requirement that the expert's opinion be based upon information reasonably relied upon by experts in a particular field is a guard against the use of inadmissible hearsay and 'does not pertain to information which the expert has not relied on.'"[33] The defendants had argued that the expert failed to effectively distinguish the American Congress of Obstetricians and Gynecologists ("ACOG") Monograph which they had relied upon to explain the cause of the injury.[34] Because the expert had not relied upon the ACOG Monograph, we held that the expert "was not required to rebut the ACOG Monograph as a condition of admissibility of his testimony."[35] Similarly, here, Dr. Adler was not required to rebut Appellees' recasting of his opinion.

These cases together suggest that reliability, for *Daubert* admissibility purposes, should be assessed by the trial court wholistically, and that in medical negligence cases, a physician's expert medical opinion as to standard of care and cause of injury may be admissible if it is based on his or her own skill, education, and training, and the facts of the case at hand (including physical examination as in *Wong* or medical records as in

---

[33] *Id.*

[34] *Id.* at 107 ("To explain the cause of the injury, the defendants and their experts relied heavily upon the American Congress of Obstetricians and Gynecologists ("ACOG") Monograph as scientific evidence that [the child]'s injury was the result of maternal endogenous forces during labor and not attributed to Dr. Wong's actions.").

[35] *Id.* at 111.

*Norman*).[36]  *Norman* and *Wong* both suggest that the central touchstone is reliability in assessing the sufficiency of an expert's opinion.  *Norman* and *Wong* also reflect a reluctance to require a formulaic approach or that specific "boxes" be checked.[37]  Although the Majority distinguished them as standard of care cases, both opinions explicitly address causation as well as standard of care.[38]

Appellees submitted as supplemental authority a recent Third Circuit case from 2024, *Pugh v. Northampton Hospital Company, LLC*, that has very similar facts and seemingly similar claims to those in this case, namely that delayed birth caused neonatal

---

[36] In fairness to the Superior Court, the parties did not brief *Norman* and *Wong* before the court issued its first opinion excluding Dr. Adler's expert testimony in March 2023.  However, the Superior Court cited *Norman* for its statement that there is a "strong preference" for admitting expert opinions "when they will assist the trier of fact in understanding the relevant facts or the evidence." *Scottoline*, 2023 WL 2322501, at *3 n.24.

[37] As Appellees' counsel observed in the December 16, 2022, Motion *in Limine* oral argument, "it's reliability in a nutshell."  App. to Opening Br. at A262; *see also id.* at A266 ("I would not say that a differential diagnosis or differential ideology [sic] is absolutely necessary.  What I would say is that some methodology that can be tested and that is acceptable and reliable is required.").

[38] The statutory requirements for expert medical testimony are set forth in 18 *Del. C.* § 6853 and § 6854.  Section 6853 requires in relevant part that an affidavit of merit be submitted by an expert witness: "The affidavit or affidavits of merit shall set forth the expert's opinion that there are reasonable grounds to believe that the applicable standard of care was breached by the named defendant or defendants and that the breach was a proximate cause of injury or injuries claimed in the complaint."  Section 6854 states in its entirety: "No person shall be competent to give expert medical testimony as to applicable standards of skill and care unless such person is familiar with the degree of skill ordinarily employed in the field of medicine on which he or she will testify." *Norman* and *Wong* address all required parts of medical expert testimony wholistically, and explicitly include causation as well as standard of care, as quoted above. *Norman*, 193 A.3d at 732 ("Dr. Soffer's deposition testimony, *considered as a whole*, is sufficient to establish the applicable standards of care, Dr. Maynard's deviations from those standards, *and injury to Ms. Norman caused by those deviations*.  His testimony is admissible.") (emphasis added); *Wong*, 204 A.3d at 111 ("Because of the permanency of the injury, Dr. Kozin formed the opinion that *the cause* of Amari's torn nerves was excessive lateral traction applied during birth.  We find that Dr. Kozin's opinion was sufficiently based upon the facts of this case to satisfy Rule 702.") (emphasis added).

10

encephalopathy which, in turn, caused the patient's autism.[39]  In *Pugh*, the plaintiff's expert in a medical malpractice case was required under Pennsylvania law to testify as to general and specific causation, which the expert was prevented from doing, and which ultimately led to the plaintiff's case being dismissed on a grant of summary judgment.  The expert's report identified the cause of the child's autism as neonatal encephalopathy.[40]  The District Court granted the defendants' *Daubert* motions after concluding that the expert's general causation opinion was unreliable and that her specific causation opinion rested on the assumption that neonatal encephalopathy can cause autism.  After supplemental briefing, the District Court entered summary judgment against the plaintiffs for failing to produce expert testimony on causation.  The Third Circuit affirmed.[41]

*Pugh* is easily distinguished from this case.  First, as Appellees acknowledged, *Pugh* is not binding on this Court because it is a federal case applying Pennsylvania law.  Second, the plaintiffs' claim, and their expert's opinion in *Pugh*, was that the HIE birth injury the child suffered was the cause of the child's ASD.  Here, that was not Dr. Adler's opinion, despite Appellees' attempts to reframe it as an opinion that HIE causes autism.  Third, the parties have cited no Delaware case that expressly adopts the Pennsylvania legal test requiring general and specific causation.  Nor have they addressed whether that standard is

---

[39] *Pugh v. Northampton Hospital Co., LLC*, 2024 WL 3581171, at *1 (3d Cir. July 30, 2024).

[40] The plaintiffs' counsel had not permitted the expert to testify as to general causation at her deposition.  The Third Circuit affirmed the District Court's decision to not hold an evidentiary hearing because "any such hearing on general causation would have unfairly surprised the defendants[.]" *Id.* at *3.

[41] *Id.* at *4.

consistent with *Norman* and *Wong*. In short, although the facts are similar, the claims and the law are not.

Appellants draw our attention to a case from the Ohio Court of Appeals, *Ellis v. Fortner*, that considered strikingly similar facts in which a child suffered an infant encephalopathy injury at birth that allegedly caused the child's later impairments, including ASD.[42] In *Ellis*, the trial court allowed the plaintiffs' proffered expert testimony that the child's HIE caused his impairments, including ASD. The defendants appealed, arguing that the trial court erred by denying their *Daubert* motion to exclude the expert testimony premised upon the theory that ASD could be caused by HIE.[43] The Ohio Court of Appeals noted both that the trial court concluded that the theory that HIE could cause ASD had gained general acceptance and that "the Ellises' experts did not make a 'blanket statement that birth trauma is the cause of ASD. Rather, they opine[d] that birth trauma [wa]s the cause of [the child's] impairments, which [the expert] conclude[d] leads to a diagnosis of ASD."[44] The Ohio Court of Appeals affirmed the trial court's decision to allow the expert testimony, stating:

> We again note that the reliability requirement of *Daubert* should not be used to exclude all evidence of questionable reliability.
>
> The [defendant] also points to the testimony of the Ellises' own expert, Dr. Stephen Glass, as rejecting the diagnosis of autism spectrum disorder. Dr. Glass, however, offered a distinction that G.E. exhibited autistic-like symptoms [as] a result of a brain injury, rather than having a primary autism

---

[42] *Ellis v. Fortner*, 169 N.E.3d 987, 991–92 (Ohio. Ct. App. 2021), *cert. denied sub nom. G.E. v. Fortner*, 181 N.E.3d 1210 (Ohio Mar. 1, 2022) (TABLE).

[43] *Id.* at 995.

[44] *Id.*

12

spectrum disorder. The trial court's own comments as noted above indicated its awareness of these nuances. Furthermore, the [defendant] was afforded the opportunity to explore this distinction in its cross-examination of Dr. Glass and its presentation of its own expert witnesses.

The [defendant] has failed to show that the trial court abused its discretion in denying its *Daubert* motion to exclude testimony of proximate cause premised upon the theory that autism spectrum disorder can be caused by HIE. Therefore, the second assignment of error is overruled.[45]

Both the trial court and the Ohio Court of Appeals recognized and accepted the nuance in the medical expert's opinion that the brain injury, HIE, caused impairments that included some symptoms that were also consistent with ASD. The Ohio Court of Appeals emphasized that "the test of reliability is flexible, and the trial court may, at its discretion, consider the factors to the extent that they are relevant."[46] Although *Ellis* is not binding on this Court, the striking similarity between the *Ellis* expert opinion and Dr. Adler's expert opinion, and the Ohio courts' acceptance of that nuance, is compelling.

Another recent case, *Trujillo v. Vail Clinic, Inc.*, is also instructive.[47] In *Trujillo*, the Colorado Court of Appeals considered a similar medical malpractice claim in which another form of infant encephalopathy (CCIE) birth injury allegedly caused the child's cerebral palsy. The trial court in *Trujillo* excluded the medical expert's testimony that the

---

[45] *Id.* at 996.

[46] The Ohio Court of Appeals observed that, "'[i]n evaluating the reliability of scientific evidence, several factors are to be considered: (1) whether the theory or technique has been tested, (2) whether it has been subjected to peer review, (3) whether there is a known or potential rate of error, and (4) whether the methodology has gained general acceptance.'" *Id.* at 992 (citations omitted). The court emphasized that, "the list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Id.* at 994.

[47] *Trujillo v. Vail Clinic, Inc.*, 480 P.3d 721 (Colo. App. 2020), *cert. denied*, 2021 WL 537812 (Colo. Feb. 8, 2021).

CCIE caused the child's cerebral palsy on the grounds that the expert conceded that this concept was not widely accepted in the medical field and had not been published in peer reviewed journals.[48] The trial court found that the component parts of the medical theory of causation were all widely accepted and reasonably reliable, but that putting those pieces together into the theory opined by the expert was not reasonably reliable. The plaintiffs' well-qualified expert opined that this was possible, while the defendants' well-qualified expert opined that it was not possible. The Colorado Court of Appeals reversed the trial court's exclusion of the expert opinion, reasoning:

> The trial court went to admirable lengths to learn about this technical medical subject. But we conclude that the trial court exceeded the bounds of its role as a gatekeeper charged only with keeping junk science from the jury. As mentioned above, the standard for admitting expert testimony is liberal because any expert opinion will be subject to further vetting at trial. Consequently, it is not for the trial court to determine whether an expert opinion is unimpeachable. To be admissible, expert opinion need only be reasonably reliable based on *the totality of the circumstances*.

> The trial court erroneously put determinative weight on the fact that CCIE, as a complete theory, had not been tested, widely accepted in the medical field, or published in peer-reviewed journals. While these factors were certainly appropriate for the court to consider, *the totality of the circumstances* also included the reliability of the underlying pathophysiological mechanisms and concepts on which CCIE is based. This underlying pathophysiology, combined with Dr. Schifrin's testimony that the pathophysiology was consistent with and supported the validity of CCIE, rendered CCIE reasonably reliable in the context of the liberal admission standard for expert testimony.

> While CCIE is not junk science, its lack of testing, widespread acceptance, and publication will almost certainly be the subject of cross-examination and countervailing expert testimony at trial and may cause a jury to reject CCIE

---

[48] *Id.* at 724.

14

as the cause of Brandon's injuries here. But that determination must be made by a jury, not a judge.[49]

In *Trujillo*, the Colorado Court of Appeals focused on the liberal admission standard for expert testimony, that the opinion need only be reasonably reliable based on the totality of the circumstances, and that admission depends on the unique factual circumstances surrounding the testimony.[50] The wholistic totality of the circumstances analysis in *Trujillo* is similar in approach to that articulated by this Court in *Norman* and *Wong*.

Appellants in this case have not framed their claim as a claim that HIE causes autism in general or caused J.S.S.'s autism specifically, either in their complaint or their briefing. Because that is not their claim, Plaintiffs were not required to offer expert evidence that HIE causes autism in general or J.S.S.'s autism specifically. Instead, as reiterated at length in their Reply Brief, Appellants' claim, and their expert's offered opinion, was that HIE caused *all* of J.S.S.'s permanent "neurological and neurodevelopmental disabilities," some of which could also meet the criteria for the diagnosis of ASD.[51] Appellants have been clear about this claim and argument from the beginning.

Rather than address Dr. Adler's more nuanced opinion, Appellees set up a straw man argument in which they contend that Plaintiffs and Dr. Adler primarily claimed that J.S.S.'s HIE caused his autism. The Superior Court accepted this reframing of Dr. Adler's

---

[49] *Id.* at 725 (emphasis added).

[50] I note in this regard, for example, that both the *Trujillo* and *Ellis* Courts of Appeals noted that testing may not be possible for ethical reasons. *Trujillo*, 480 P.3d at 726 ("causing CCIE would be unethical and therefore it is impossible to test"); *Ellis*, 169 N.E.3d at 993.

[51] Reply Br. at 2–3.

15

opinion and then rejected his expert opinion on that basis. But that was never Plaintiffs' claim or Dr. Adler's expert opinion. Again, the expert medical opinion that Dr. Adler repeatedly stated is that "all of J.S.S.'s neurological and neurodevelopmental disabilities are the result of the hypoxic ischemic brain injury that J.S.S suffered during the labor and delivery process."[52] He separately acknowledged J.S.S.'s later autism diagnosis and that some of J.S.S.'s symptoms also meet the criteria for ASD, while firmly maintaining his medical opinion.

The Majority acknowledges this nuance in Section III.B of the Majority opinion. First, the Majority states: "Dr. Adler concluded in his first two reports that J.S.S.'s neurological and neurodevelopmental disabilities and behavioral syndrome within the autism spectrum were caused by HIE during his labor and delivery." The Majority then states: "It is unclear whether Dr. Adler meant to express two related but separate opinions in his reports – first, that J.S.S.'s HIE caused certain neurological and neurodevelopmental disabilities; and second, that J.S.S.'s HIE caused behavioral disabilities some of which are consistent with an ASD diagnosis."

The Majority ultimately also rejects this more accurate framing of Dr. Adler's opinion on the supposed distinction that as a physician he was qualified to diagnose J.S.S. with HIE and with neurological, neurodevelopmental, and behavioral disabilities, but was not qualified to opine that J.S.S.'s undisputed HIE caused permanent brain injury consisting of motor, language, behavioral, cognitive, and memory problems. The Majority

---

[52] *Id.* at A62–63 (Dr. Adler's First Expert Report).

acknowledges that Dr. Adler's reliance on medical literature drawing a connection between HIE and later cognitive deficits might be sufficient as a general matter, but concludes ultimately that Dr. Adler "failed to support his opinion *specifically as to J.S.S.* with anything other than *ipse dixit* – that J.S.S.'s HIE at birth caused his neurological and neurodevelopmental disabilities."

Both the Superior Court and the Majority cite a Superior Court case, *Minner*, for the notion that an expert's opinions "cannot be based simply on the *ipse dixit* of the expert" but require additional support.[53] The Majority's reliance on *Minner* is misplaced for multiple reasons. First, neither *Minner*, a Superior Court case, nor the United States Supreme Court case it cites, *Joiner*, are medical malpractice cases. Rather, both cases involved toxic exposure claims. Second, *Minner* was decided in 2000, eighteen years before *Norman* and *Wong*, the two cases that are clearly more relevant and announce the specific guidance for reliability under *Daubert* for a physician's expert opinion in a medical malpractice case.

I disagree with the Majority's *ipse dixit* characterization of Dr. Adler's opinions. It is undisputed that Dr. Adler was a well-qualified medical expert with more than forty years of experience in pediatric neurology and HIE, including HIE's permanent brain damage and ongoing treatment of the long-term effects. Dr. Adler was qualified to offer his opinion not only by his training and his experience, but also by his examination of the facts of this

---

[53] *Minner v. Am. Mortg. & Guar. Co.*, 791 A.2d 826, 851 (Del. Super. 2000) (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.")).

case. It is undisputed that he personally examined J.S.S. and reviewed J.S.S.'s medical records three times. He explained how his training and experience led to his conclusions and how he applied his experience to the specific facts of this case. Thus, Dr. Adler's opinion that J.S.S.'s undisputed HIE caused permanent brain damage and all of J.S.S.'s neurological and neurodevelopmental disabilities is not unsupported *ipse dixit*. Rather, it meets the wholistic reliability requirements of *Norman* and *Wong*.

The Superior Court's exclusion of Dr. Adler's opinion is inconsistent with our rulings. As in *Norman*, this case revolves around the reliability factor of *Daubert* in a medical malpractice case, and also as in *Norman*, the Superior Court in this case interpreted this factor to require that Dr. Adler's opinion be based upon medical literature or peer reviewed studies to corroborate his opinion. That is inconsistent with this Court's holding in *Norman* and *Wong*.[54] As this Court explained in *Norman*:

> The Superior Court appears to have interpreted this factor to require that the expert's opinion be based upon medical literature or peer reviewed publications or some other source which corroborates the expert's analysis. An opinion by a doctor "based on his own knowledge" was deemed insufficient.
>
> We think that the Superior Court misinterpreted this third factor. The origin of the factor can be found in the following passage from *Daubert:*
>
> > Throughout, a judge assessing a proffer of expert scientific testimony under Rule 702 should also be mindful of other applicable rules. Rule 703 provides that expert opinions based on otherwise inadmissible hearsay are to be admitted only if the facts or data are 'of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject.'

---

[54] After reframing Dr. Adler's opinion as a conclusion that HIE can cause autism, the Superior Court stated: "Dr. Adler's reports do not cite any article, study, or other authority in support of his conclusion that HIE can cause ASD." *Scottoline*, 2023 WL 2325701, at *4.

18

> This makes clear that the third factor is derived from D.R.E. 703's provision that "[i]f of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted." The third factor was thought of by the author of *Daubert* as a guard against the use of unreliable hearsay. The factor does not pertain to information which the expert has not relied on. In this case, the information relied on by Dr. Soffer are Ms. Norman's medical records and the depositions of Ms. Norman and Dr. Maynard. He arrives at his opinions by applying his training and experience to the facts of this case. The information relied on by Dr. Soffer is clearly sufficient under D.R.E. 703 to justify admission of his opinions under D.R.E. 702. Medical literature or peer reviewed publications may be useful factors in an appropriate case, and may be relevant to the defense in this case, but they have no bearing on the admissibility of Dr. Soffer's opinions.[55]

This Court's reasoning from *Norman* applies neatly in this case. As we emphasized in *Norman*, there is a "strong preference" for admitting expert opinions "when they will assist the trier of fact in understanding the relevant facts or the evidence."[56] It is of course entirely possible that there are problems with the accuracy of Dr. Adler's opinion or with the conclusions he draws. But the accuracy of his opinion, the credibility of his testimony, and how much weight to assign that evidence should be left to the jury to decide. The cause of J.S.S.'s permanent disabilities should be in the hands of a jury to decide after hearing cross-examination, presentation of contrary evidence, and competing experts.

Because I believe that Dr. Adler's opinion has been improperly conflated into an opinion that HIE causes ASD, and because the court below then did not fully consider and apply our decisions in *Norman* and *Wong* to his actual opinion, I would reverse the

---

[55] *Norman*, 193 A.3d at 731.

[56] *Id.* at 730.

19

evidentiary rulings of the Superior Court and remand for further proceedings.[57]  Because I

believe that justice is not served by an affirmance here, and for the reasons stated above, I

respectfully dissent.

---

[57] I would also reverse the exclusion of the Masterson report as that exclusion was largely, if not entirely, derivative of the exclusion of Dr. Adler's report.